# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ELIJAH E. CUMMINGS, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 1:17-cv-02308-APM |
| EMILY W. MURPHY,[*] | Hon. Amit P. Mehta |
| Defendant. | |

## DEFENDANT'S MOTION TO DISMISS THE COMPLAINT PURSUANT TO RULES 12(B)(1) AND 12(B)(6)

Defendant Emily W. Murphy, Administrator, General Services Administration, by and through undersigned counsel, respectfully moves to dismiss this case with prejudice pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  As explained in the accompanying memorandum of law, individual members of Congress lack standing to vindicate the institutional interests of Congress under the Supreme Court's decision in *Raines v. Byrd*, 521 U.S. 811 (1997). Even if Plaintiffs had standing, their claims would be properly dismissed for failure to state a claim upon which relief may be granted.  A proposed order accompanies this motion.

Dated:  January 8, 2018                Respectfully submitted,

                                              CHAD A. READLER
                                              Acting Assistant Attorney General

                                              JESSIE K. LIU
                                              U.S. Attorney for the District of Columbia

---

[*] On December 12, 2017, Emily W. Murphy was sworn in as Administrator of the General Services Administration.  She is automatically substituted as Defendant pursuant to Federal Rule of Civil Procedure 25(d).

ELIZABETH J. SHAPIRO
Deputy Director, Federal Programs Branch

/s/ *Steven A. Myers*
STEVEN A. MYERS (NY Bar No. 4823043)
Trial Attorney
Federal Programs Branch
U.S. Department of Justice, Civil Division
Telephone:  (202) 305-8648
Fax:  (202) 616-8460
Email:  Steven.A.Myers@usdoj.gov

Mailing Address:
Post Office Box 883
Washington, DC 20044

Courier Address:
20 Massachusetts Ave., NW Rm. 7334
Washington, DC 20001

*Counsel for Defendant*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ELIJAH E. CUMMINGS, *et al.*,

Plaintiffs,

v.

EMILY W. MURPHY,

Defendant.

Case No. 1:17-cv-02308-APM
Hon. Amit P. Mehta

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF MOTION TO DISMISS THE COMPLAINT**
**PURSUANT TO RULES 12(B)(1) AND 12(B)(6)**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................................iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND................................................................................................................. 3

I.      Statutory Background .............................................................................................. 3

II.     Prior Litigation Under 5 U.S.C. § 2954 ................................................................. 6

        A.      *Waxman I* ................................................................................................... 6

        B.      *Waxman II* .................................................................................................. 7

III.    The Facts Of This Case.......................................................................................... 8

STANDARD OF REVIEW.............................................................................................. 11

ARGUMENT .................................................................................................................... 11

I.      Plaintiffs, As Individual Legislators, Lack Standing To Sue For Injuries To
        Congress's Institutional Interests......................................................................... 11

        A.      *Raines v. Byrd* ......................................................................................... 13

        B.      Under *Raines*, Plaintiffs Lack Standing................................................. 15

                1.      Plaintiffs Are Not Personally Injured By Defendant's Failure To Produce
                        The Documents They Demand.................................................... 15

                2.      Plaintiffs' Alleged Institutional Injury Cannot Confer Standing. ................. 17

                3.      Historical Practice ..................................................................... 22

II.     Plaintiffs Do Not Have A Cause Of Action Entitling Them To Judicial
        Enforcement Of 5 U.S.C. § 2954.......................................................................... 23

        A.      Plaintiffs Must Have A Statutory Right Of Action To Maintain This Suit. ......... 24

        B.      5 U.S.C. § 2954 Does Not Create A Cause Of Action. ...................................... 24

        C.      Plaintiffs Lack A Cause Of Action Under The APA........................................... 25

                1.      APA Review Is Precluded By Statute. ........................................ 25

                2.      Withholding Information Does Not Constitute Agency Action That Is
                        Reviewable Under The APA. ...................................................... 30

        D.      Plaintiffs Cannot Proceed Under The Declaratory Judgment Act. ...................... 32

        E.      Plaintiffs Cannot Seek A Writ Of Mandamus Under The All Writs Act. ............ 33

III.    The Court Should Decline To Hear This Case Under Principles Of Equitable
        Discretion. ............................................................................................................. 35

IV.     Should The Court Reach The Merits, 5 U.S.C. § 2954 Does Not Apply. .................. 36

        CONCLUSION ............................................................................................................ 39

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Alaska Legislative Council v. Babbitt,*
    181 F.3d 1333 (D.C. Cir. 1999) ............................................................................. 18

*\*Alexander v. Sandoval,*
    532 U.S. 275 (2001) ............................................................................................... 24

*\*Ali v. Rumsfeld,*
    649 F.3d 762 (D.C. Cir. 2011) ............................................................................... 32

*American Trucking Assoc. v. United States,*
    755 F.2d 1292 (7th Cir. 1985) ............................................................................... 30

*\*Arizona State Legislature v. Arizona Independent Redistricting Commission,*
    135 S. Ct. 2652 (2015) ......................................................................... 18, 19, 21, 22

*Armstrong v. Exceptional Child Center, Inc.,*
    135 S. Ct. 1378 (2015) ........................................................................................... 24

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ............................................................................................... 11

*Asiana Airlines v. FAA,*
    134 F.3d 393 (D.C. Cir. 1998) ............................................................................... 31

*Baird v. Norton,*
    266 F.3d 408 (6th Cir. 2001) ................................................................................. 18

*BankAmerica Corp. v. United States,*
    462 U.S. 122 (1983) ............................................................................................... 28

*Barenblatt v. United States,*
    360 U.S. 109 (1959) ............................................................................................... 36

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ............................................................................................... 11

*Bender v. Williamsport Area Sch. Dist.,*
    475 U.S. 534 (1986) ............................................................................................... 22

*\*Block v. Cmty. Nutrition Inst.,*
    467 U.S. 340 (1984) ....................................................................................... *passim*

*Bridges v. Blue Cross & Blue Shield Ass'n,*
   935 F. Supp. 37 (D.D.C. 1996) .................................................................. 32

*C&E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth.,*
   310 F.3d 197 (D.C. Cir. 2002) .................................................................. 32

*\*Campbell v. Clinton,*
   52 F. Supp. 2d 34 (D.D.C. 1999) ....................................................... 22, 23

*\*Campbell v. Clinton,*
   203 F.3d 19 (D.C. Cir. 2000) ............................................... 18, 19, 22, 23

*Carter v. U.S. Department of Commerce,*
   307 F.3d 1084 (9th Cir. 2002) ................................................................... 7

*Chem. Weapons Working Grp., Inc. v. U.S. Dep't of the Army,*
   111 F.3d 1485 (10th Cir. 1997) ................................................................ 30

*Cheney v. U.S. Dist. Court for Dist. of Columbia,*
   542 U.S. 367 (2004) .................................................................................. 37

*\*Chenoweth v. Clinton,*
   181 F.3d 112 (D.C. Cir. 1999) ........................................................... 17, 23

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) .................................................................................. 12

*\*Coleman v. Miller,*
   307 U.S. 433 (1939) .................................................................................. 14

*Columbia Power Trades Council v. Dep't of Energy,*
   671 F.2d 325 (9th Cir. 1982) .................................................................... 34

*Comm. on Judiciary v. Miers,*
   558 F. Supp. 2d 53 (D.D.C. 2008) ..................................................... 14, 21

*Comm. on Oversight & Gov't Reform v. Holder,*
   979 F. Supp. 2d 1 (D.D.C. 2013) ............................................................. 21

*C.F. Commc'ns Corp. v. FCC,*
   128 F.3d 735 (D.C. Cir. 1997) .................................................................. 31

*\*Common Cause v. Biden,*
   909 F. Supp. 2d 25 (D.D.C. 2012) ..................................................... 17, 21

*Conservation Force, Inc. v. Jewell*,
   733 F.3d 1200 (D.C. Cir. 2013) ......................................................... 12

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) .......................................................................... 12

*Dellums v. Smith*,
   797 F.2d 817 (9th Cir. 1986) ............................................................ 27

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
   133 F. Supp. 3d 70 (D.D.C. 2015) .................................................... 32

*Doe v. U.S. Parole Comm'n*,
   602 F. App'x 530 (D.C. Cir. 2015) ................................................... 32

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
   485 U.S. 568 (1988) .......................................................................... 37

*Estate of Michael ex rel. Michael v. Lullo*,
   173 F.3d 503 (4th Cir. 1999) ............................................................ 34

*Fla. Audubon Soc'y v. Bentsen*,
   94 F.3d 658 (D.C. Cir. 1996) ............................................................ 12

*Freedom Watch, Inc. v. Obama*,
   807 F. Supp. 2d 28 (D.D.C. 2011) .................................................... 24

*FTC v. Bunte Bros., Inc.*
   312 U.S. 349 (1941) ....................................................................... 27-28

*Glenn v. Thomas Fortune Fay*,
   222 F. Supp. 3d 31 (D.D.C. 2016) .................................................... 32

*Goldwater v. Carter*,
   444 U.S. 996 (1979) .......................................................................... 23

*Gonzaga Univ. v. Doe*,
   536 U.S. 273 (2002) .......................................................................... 24

*Greenpeace USA v. Stone*,
   748 F. Supp. 749 (D. Haw. 1990) ..................................................... 31

*Gregg v. Barrett*,
   771 F.2d 539 (D.C. Cir. 1985) .......................................................... 36

*Guerrero v. Clinton*,
  157 F.3d 1190 (9th Cir. 1998) ........................................................ 5, 30

*Haase v. Sessions*,
  835 F.2d 902 (D.C. Cir. 1987) .............................................................. 11

*Harrington v. Bush*,
  553 F.2d 190 (D.C. Cir. 1977) .............................................................. 18

*Heikkila v. Barber*,
  345 U.S. 229 (1953) .............................................................................. 26

*House v. Burwell*,
  130 F. Supp. 3d 53 (D.D.C. 2015) ....................................................... 22

*In re Blackwater Sec. Consulting, LLC*,
  460 F.3d 576 (4th Cir. 2006) ............................................................... 34

*In re Chapman*,
  166 U.S. 661 (1897) ................................................................................ 4

*In re Cheney*,
  406 F.3d 723 (D.C. Cir. 2005) .............................................................. 33

*In re Sealed Case*,
  121 F.3d 729 (D.C. Cir. 1997) ................................................................ 6

*Intelsat USA Sales Corp. v. Juch-Tech, Inc.*,
  935 F. Supp. 2d 101 (D.D.C. 2013) ..................................................... 32

*Jones v. United States*,
  526 U.S. 227 (1999) .............................................................................. 28

*Jones v. United States*,
  529 U.S. 848 (2000) ........................................................................ 37, 39

*Kerr v. Hickenlooper*,
  824 F.3d 1207 (10th Cir. 2016) ........................................................... 22

*Kucinich v. Bush*,
  236 F. Supp. 2d 1 (D.D.C. 2002) ............................................... 15, 17, 18

*Kucinich v. Def. Fin. & Accounting Serv.*,
  183 F. Supp. 2d 1005 (N.D. Ohio 2002) ...................................... 15, 18

*Kucinich v. Obama,
   821 F. Supp. 2d 110 (D.D.C. 2011) ...................................................................... 22

Lujan v. Defenders of Wildlife,
   504 U.S. 555 (1992).............................................................................................. 11, 12

Malek v. Flagstar Bank,
   70 F. Supp. 3d 23 (D.D.C. 2014) .......................................................................... 32

Marbury v. Madison,
   5 U.S. (1 Cranch) 137 (1803)............................................................................... 34-35

McGrain v. Daugherty,
   273 U.S. 135 (1927).............................................................................................. 15-16

Metz v. BAE Sys. Tech. Sols. & Servs. Inc.,
   774 F.3d 18 (D.C. Cir. 2014) ................................................................................ 32

Mohamed v. Select Portfolio Servicing, Inc.,
   215 F. Supp. 3d 85 (D.D.C. 2016) ........................................................................ 32

Nat. Res. Def. Council v. Lujan,
   768 F. Supp. 870 (D.D.C. 1991) ........................................................................... 30

Nev. Comm'n on Ethics v. Carrigan,
   564 U.S. 117 (2011).............................................................................................. 15

Newdow v. U.S. Congress,
   313 F.3d 495 (9th Cir. 2002) ................................................................................ 18

PDK Labs, Inc. v. Reno,
   134 F. Supp. 2d 24 (D.D.C. 2001) ........................................................................ 33

Powell v. McCormack,
   395 U.S. 486 (1969).............................................................................................. 15

*Pub. Citizen v. U.S. Dep't of Justice,
   491 U.S. 440 (1989).............................................................................................. 37, 39

*Raines v. Byrd,
   521 U.S. 811 (1997).............................................................................................. passim

*Reed v. Cty. Comm'rs,
   277 U.S. 376 (1928).............................................................................................. 5, 27

*Riegle v. Fed. Open Market Comm.,*
    656 F.2d 873 (D.C. Cir. 1981) ........................................................................ 35,36

*Ross v. United States,*
    460 F. Supp. 2d 139 (D.D.C. 2006) ...................................................................... 34

*Schilling v. Rogers,*
    363 U.S. 666 (1960) .............................................................................................. 32

*Seized Prop. Recovery, Corp. v. U.S. Customs & Border Prot.,*
    502 F. Supp. 2d 50 (D.D.C. 2007) ....................................................................... 32

*Senate Select Comm. v. Nixon,*
    498 F.2d 725 (D.C. Cir. 1974) .............................................................................. 36

*Slate v. Pub. Def. Serv.,*
    31 F. Supp. 3d 277 (D.D.C. 2014) ......................................................................... 8

*State of W. Va. v. U.S. Dep't of Health & Human Servs.,*
    145 F. Supp. 3d 94 (D.D.C. 2015) ........................................................................ 13

*Superlease Rent-A-Car, Inc. v. Budget Rent-A-Car of Md., Inc.,*
    No. 89-0300, 1989 WL 39393 (D.D.C. Apr. 13, 1989) ........................................ 32

*Swan v. Clinton,*
    100 F.3d 973 (D.C. Cir. 1996) .............................................................................. 33

*Switchmen's Union of N. Am. v. Nat'l Mediation Bd.,*
    320 U.S. 297 (1943) .............................................................................................. 30

*Taylor Bay Prot. Ass'n v. EPA,*
    884 F.2d 1073 (8th Cir. 1989) .............................................................................. 30

*Touche Ross & Co. v. Redington,*
    442 U.S. 560 (1979) .............................................................................................. 24

*U.S. Ecology, Inc. v. U.S. Dep't of Interior,*
    231 F.3d 20 (D.C. Cir. 2000) ................................................................................ 11

*U.S. House of Representatives v. U.S. Dep't of Commerce,*
    11 F. Supp. 2d 76 (D.D.C. 1998) .......................................................................... 22

*United States v. AT&T,*
    551 F.2d 384 (D.C. Cir. 1976) ................................................................... 6, 21, 35

*United States v. Corrick*,
   298 U.S. 435 (1936)............................................................................................ 12

*United States v. Fausto*,
   484 U.S. 439 (1988)............................................................................................ 26

*United States v. Hays*,
   515 U.S. 737 (1995)............................................................................................ 12

*United States v. House of Representatives*,
   556 F. Supp. 150 (D.D.C. 1983).................................................................. 35, 36

*United States v. Instruments, S.A.*,
   807 F. Supp. 811 (D.D.C. 1992)......................................................................... 32

*W. Va. ex rel. Morrissey v. U.S. Dep't of Health & Human Servs.*,
   827 F.3d 81 (D.C. Cir. 2016)............................................................................... 13

*\*Walker v. Cheney*,
   230 F. Supp. 2d 51 (D.D.C. 2002).............................................................. *passim*

*Walpin v. Corp. for Nat'l. & Cmty. Serv.*,
   718 F. Supp. 2d 18 (D.D.C. 2010)...................................................................... 32

*Warth v. Seldin*,
   422 U.S. 490 (1975)............................................................................................ 12

*Waxman v. Evans*,
   52 F. App'x 84 (9th Cir. 2002) ............................................................................. 7

*Waxman v. Evans*,
   No. 01-4530, 2002 WL 32377615 (C.D. Cal. Jan. 18, 2002).............................. 6

*\*Waxman v. Thomspon*,
   No. 04-3467, ECF No. 35 (C.D. Cal. July 24, 2006)...................................... *passim*

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001)............................................................................................ 28

*Wilson v. United States*,
   369 F.2d 198 (D.C. Cir. 1966).......................................................................... 4, 27

## **Statutes**

2 U.S.C. § 166.......................................................................................................... 29

2 U.S.C. § 601.......................................................................................................... 29

2 U.S.C. § 191 ................................................................................................ 5

*2 U.S.C. § 192 ......................................................................................... 4, 27

*2 U.S.C. § 194 ......................................................................................... 5, 27

2 U.S.C. § 288b ............................................................................................ 29

2 U.S.C. § 288d ............................................................................................ 29

5 U.S.C. § 551 ........................................................................................ 30, 31

5 U.S.C. § 552 .............................................................................................. 31

5 U.S.C. § 701 ........................................................................................ 11, 25

5 U.S.C. § 702 ........................................................................................ 25, 31

5 U.S.C. § 704 ........................................................................................ 25, 30

5 U.S.C. § 706 .............................................................................................. 25

*5 U.S.C. § 2954 .................................................................................... *passim*

28 U.S.C. § 1361 ................................................................................ 10, 34, 35

28 U.S.C. § 1365 .......................................................................................... 29

28 U.S.C. § 1651 ...................................................................................... 10-11

28 U.S.C. § 2201 .......................................................................................... 10

31 U.S.C. § 716 ...................................................................................... 19, 29

Act of January 24, 1857, Ch. 19, 11 Stat. 155 (1857) .................................... 4

*Act of May 29, 1928, Ch. 901, 45 Stat. 996 (1928) ..................................... 3

Pub. L. No. 79-404, 60 Stat. 237 (1946) ...................................................... 31

Pub. L. No. 87-748, 76 Stat. 744 (1962) ...................................................... 35

Pub. L. No. 89-487, 80 Stat. 250 (1996) ...................................................... 31

Pub. L. No. 104-14, 109 Stat. 186 (1995) ...................................................... 1

## Legislative Materials

108 Cong. Rec. 20,079 (1962) ...................................................................... 35

108 Cong. Rec. 20,093 (1962) ...................................................................... 35

*117 Cong. Rec. 42,966 (1971) ..................................................................... 38

*S. Rep. No. 70-1320 (1928) ........................................................... 3, 4, 16, 37

*H.R. Rep. No. 70-1757 (1928) .......................................................... 4, 16, 37

S. Rep. No. 87-1992 (1962) .......................................................................... 35

*Executive Privilege — Secrecy in Gov't:  Hearings before Subcomm. on Intergovernmental Relations of the S. Comm. on Gov't Operations,
94th Cong. 107 (1975)............................................................................................38

*Congressional Research Service, RL30240,
Congressional Oversight Manual (Jan. 6, 2011) ...............................................2, 38

*Morton Rosenberg, Congressional Research Service, 95-464, Investigative Oversight:  An Introduction to the Law, Practice, and Procedure of Congressional Inquiry......................3, 25, 38

*Rules of the House of Representatives,
http://clerk.house.gov/legislative/house-rules.pdf  .................................................4, 27

*The authorities upon which we chiefly rely are marked with asterisks.

## INTRODUCTION

More than twenty years ago, in *Raines v. Byrd*, 521 U.S. 811 (1997), the Supreme Court announced the principle of legislative standing that controls this action:  individual legislators lack standing to vindicate the institutional interests of the legislative body in which they serve. Legislators may go to court to demand something to which they are personally entitled (their paycheck or their seat in the legislature), or they may contend that their votes have been entirely nullified by unlawful action.  Should they wish to contend that the legislative body as a whole has been injured, however, they must convince a majority of their colleagues to authorize their suit so that they can sue on the legislature's behalf.

Plaintiffs are seventeen members of the House of Representatives' Committee on Oversight and Government Reform ("the Oversight Committee"); they do not constitute a majority of the members of that committee.  These members are dissatisfied with the General Services Administration's ("GSA's") response to certain letters demanding documents under 5 U.S.C. § 2954.  That statute provides that "[a]n Executive agency, on request of the Committee on Government Operations of the House of Representatives, or of any seven members thereof . . . shall submit any information requested of it relating to any matter within the jurisdiction of the committee."  5 U.S.C. § 2954.[1]  The statute does not vest any member of Congress with personal rights; rather, as in *Raines*, if "one of the Members were to retire tomorrow, he would no longer have a claim."  *Raines*, 521 U.S. at 821.

---

[1] The House Committee on Government Operations no longer exists.  A 1995 statute provides that references to that Committee in earlier laws "shall be treated as referring to the Committee on Government Reform and Oversight of the House of Representatives."  References in Law to Committees and Officers of the House of Representatives, Pub. L. No. 104-14, § 1(a)(6), 109 Stat. 186 (1995).  Although the "Committee on Government Reform and Oversight" is now named the "Committee on Oversight and Government Reform," that change does not appear to have had any substantive impact on the Committee's jurisdiction.

Applying this well-established law, the only court to consider individual legislators' standing under 5 U.S.C. § 2954 has held that they lack standing to litigate under the statute. *See generally* Order Granting Motion to Dismiss, *Waxman v. Thompson*, No. 04-3467, ECF No. 35, at 22 (C.D. Cal. July 24, 2006) (unpublished) (Ex. 1) ("[W]hen defendant declined to produce documents in response to plaintiffs' § 2954 request, plaintiffs did not suffer a personal injury as that term is defined in *Raines*.  Rather, Congress, on whose behalf they acted, suffered institutional injury . . . . This is precisely the type of injury that, under *Raines*, deprives individual legislators of standing to sue."); *see also* Congressional Research Service, RL30240, Congressional Oversight Manual 72 (Jan. 6, 2011) (describing this case:  "*Bound by the Supreme Court's precedent*, the district court concluded that when the Secretary refused to produce the documents requested pursuant to section 2954, plaintiffs did not suffer a personal injury as that term is defined by *Raines*." (emphasis added)).

Even if Plaintiffs had standing, their action would still be properly dismissed on several additional grounds.  First, Plaintiffs have no cause of action:  5 U.S.C. § 2954 says absolutely nothing about enforcement or judicial review:  not only does it fail to provide a cause of action, but it is best understood, in light of the panoply of statutes and rules describing how Congress can enforce its requests for information, as precluding judicial review.  Nor can Plaintiffs proceed under the Administrative Procedure Act ("APA"), under the Declaratory Judgment Act, or by writ of mandamus.

Finally, even if the Court were to reach the merits, it should still dismiss this action. Congress enacted 5 U.S.C. § 2954 as part of a statute eliminating a requirement that the Executive Branch produce more than 120 different reports to Congress.  The legislative history makes clear that 5 U.S.C. § 2954 was enacted to "make[] it possible to require *any report discontinued by the*

*language of this bill* to be resubmitted to either House upon its necessity becoming evident to the membership of either body." S. Rep. No. 70-1320, at 4 (1928) (emphasis added). As the Congressional Research Service has recognized, the statute is best read consistently with this legislative history. *See* Morton Rosenberg, Congressional Research Service, 95-464, Investigative Oversight: An Introduction to the Law, Practice, and Procedure of Congressional Inquiry 44 (Apr. 7, 1995) ("The legislative history . . . indicates that the purpose of the 1928 act was not to assert a sweeping right of Congress to obtain any information it might desire from the executive branch . . . . [T]he scope of 5 U.S.C. § 2954 is closely tied to the 128 reports abolished by section 1 of the 1928 legislation."). Reading the statute consistently with its legislative history is particularly appropriate here because reading it to require the Executive Branch to produce to Congress literally any document within its possession would raise grave constitutional concerns.

For these reasons, and those discussed more fully below, Defendant respectfully requests that the Court grant this motion and dismiss the case with prejudice.

## BACKGROUND

### I.     Statutory Background

5 U.S.C. § 2954 was enacted as section 2 of the Act of May 29, 1928, ch. 901, 45 Stat. 996. Section 1 of that Act repealed over 120 statutory provisions requiring federal agencies to submit periodic reports to Congress that Congress believed were obsolete. At the same time, Congress adopted section 2, now codified at 5 U.S.C. § 2954, to maintain the ability of each House of Congress to obtain the information previously contained in the discontinued reports. Thus, for example, the Senate report observed that section 2 had been added to "make[] it possible to require any report discontinued by the language of this bill to be resubmitted to either House upon its

necessity becoming evident to the membership of either body."  S. Rep. No. 70-1320, at 4; *see also* H.R. Rep. No. 70-1757, at 6 (1928).[2]

As to information falling outside the scope of the discontinued reports, Congress has other measures for obtaining documents that either the House or Senate, or any committee or subcommittee thereof, might require.  Under longstanding House Rules, each committee and subcommittee may issue subpoenas for "the production of such books, records, correspondence, memoranda, papers, and documents as it considers necessary," so long as "authorized by the committee or subcommittee, a majority being present," or by the committee chair (if committee rules so provide).  *See* Rules of the House of Representatives ("House Rules"), Rule XI, § 2(m)(1)(B) & (3)(A)(i), http://clerk.house.gov/legislative/house-rules.pdf.  Yet under these rules, compliance "with a subpoena issued by a committee or subcommittee . . . may be enforced *only as authorized or directed by the House*."  House Rules § 2(m)(3)(C) (emphasis added); *In re Chapman*, 166 U.S. 661, 667 (1897); *Wilson v. United States*, 369 F.2d 198, 203 (D.C. Cir. 1966).  Pursuant to procedures that Congress established by law in 1857, *see* Act of January 24, 1857, ch. 19, 11 Stat. 155, once the House or Senate authorizes enforcement of a subpoena, it must certify the matter for the commencement of judicial action to the appropriate United States Attorney.  *See* 2 U.S.C. §§ 192, 194.  Thus, the very day before 5 U.S.C. § 2954 was enacted, the Supreme Court held that a Senate Committee could not sue to enforce a demand for documents:

> It has been customary for the Senate — and the House as well — to rely on its own power to compel . . . production of evidence in investigations made by it or through its committees.  By means of its own process . . . the Senate is empowered to obtain evidence relating to the matters committed to it by the Constitution.  And Congress

---

[2] The House Committee similarly explained that, "[t]o save any question as to the *right of the House of Representatives* to have furnished [to it] any of the information contained in the reports proposed to be abolished, a provision has been added to the bill requiring such information to be furnished to the Committee on Expenditures in the Executive Departments or upon the request of any seven members thereof.  H.R. Rep. No. 70-1757, at 6 (emphasis added).

has passed laws [2 U.S.C. §§ 191-194] calculated to facilitate such investigations.

…

The context, the established practice of the Senate to rely on its own powers, and the attending circumstances, oppose the construction for which petitioners contend, and show that the Senate did not intend to authorize the committee, or anticipate that there might be need, to invoke the power of the Judicial Department. Petitioners are not "authorized by law to sue."

*Reed v. Cty. Comm'rs*, 277 U.S. 376, 388-89 (1928) (citation omitted).   The House of

Representatives has explained, in opposing the last suit brought by individual members of

Congress against the Executive Branch under 5 U.S.C. § 2954, that these rules are "designed to

maintain institutional control over the House's investigatory authority," and that "[w]ithout such

institutional control, the courts, rather than the House, would decide what information is needed

for legislative purposes, and the House's ability to resolve information access disputes without

resort to litigation would be severely curtailed."   *See* Amicus Curiae Brief of Bipartisan Legal

Advisory Group of the U.S. House of Representatives, *Waxman v. Thompson*, No. 04-03467, ECF

No. 23, at 2 (C.D. Cal. Aug. 19, 2004) ("House *Waxman* Brief") (Ex. 2).

Although there are means by which Congress may attempt to invoke judicial process to

obtain information that it desires, Congress has only rarely invoked the courts to obtain information

in the hands of Executive Branch officials.   *Cf., e.g.*, *infra* note 9 (explaining why the cases that

have permitted a duly authorized committee to sue the Executive Branch do not apply here).

Instead, Congress has a variety of means at its disposal — including powers of legislation,

appropriation, and investigation — through which it can work its will, and the political branches

have traditionally resolved their differences through negotiation and compromise.   *See, e.g.*,

*Guerrero v. Clinton*, 157 F.3d 1190, 1196 (9th Cir. 1998) ("It scarcely bears more than passing

mention that the most representative branch is not powerless to vindicate its interests or ensure

Executive fidelity to Legislative directives").   Thus, "few executive-congressional disputes over

access to information have ended up in the courts," *In re Sealed Case*, 121 F.3d 729, 739 (D.C. Cir. 1997), and properly so.  In light of the "nerve-center constitutional questions" raised by these inter-Branch disputes — pitting Congress's powers of investigation against the confidentiality essential to the proper functioning of the Executive Branch, *United States v. AT&T*, 551 F.2d 384, 394 (D.C. Cir. 1976) — the courts have been "reluctan[t] to interfere in [such] political battles." *In re Sealed Case*, 121 F.3d at 739.

## II.    Prior Litigation Under 5 U.S.C. § 2954

In the ninety-year history of 5 U.S.C. § 2954, individual legislators have only ever twice sought to invoke it in court.  The first case was dismissed as moot (and the order vacated) when the documents at issue were separately ordered to be released under the Freedom of Information Act, and the second was dismissed for lack of standing pursuant to *Raines v. Byrd*.

### A.    *Waxman I*

In *Waxman v. Evans*, No. 01-4530, 2002 WL 32377615 (C.D. Cal. Jan. 18, 2002) ("*Waxman I*"), sixteen members of Congress sought to compel the Secretary of Commerce to disclose certain data pertaining to the 2002 census under 5 U.S.C. § 2954.  Defendants argued that, because the case had arisen out of a political dispute, the court should refrain from hearing it under the doctrine of equitable discretion.  *Id.* at 1-2.  Defendants alternatively argued that 5 U.S.C. § 2954 should be construed only as preserving Congress's access to the information formerly contained in the reports abolished by section 1 of the 1928 Act.  *Id.* at 7-10.  The court rejected these arguments and ordered the data released.  The government moved for reconsideration, contending that the plaintiffs lacked standing and had failed to identify a cause of action.  *See* Civil Minutes, *Waxman I*, ECF No. 42, at 2-3 (C.D. Cal. Mar. 21, 2002).  The court declined to consider these arguments on the ground that the government could have presented them in support of its original motion to dismiss but had not done so.  *Id.* at 3.

6

On the government's appeal, the Ninth Circuit held that its decision in *Carter v. U.S. Department of Commerce*, 307 F.3d 1084 (9th Cir. 2002), requiring disclosure of the same census data pursuant to the Freedom of Information Act, had rendered *Waxman I* moot.  The Ninth Circuit thus vacated the district court's order and remanded with instructions to dismiss.  *See Waxman v. Evans*, 52 F. App'x 84 (9th Cir. 2002) ("We REVERSE and VACATE the judgment below and REMAND to the district court with instructions to DISMISS the action as moot.").

### B.      *Waxman II*

Less than two years later, eighteen members of Congress sued the Secretary of Health and Human Services under 5 U.S.C. § 2954, seeking documents pertaining to the Medicare Prescription Drug and Modernization Act of 2003.  *See generally Waxman v. Thompson*, No. 04-3467 (C.D. Cal.).  In a comprehensive opinion, the court held that Plaintiffs lacked standing to pursue their claims under *Raines*.  *See* Order Granting Motion to Dismiss, *Waxman v. Thompson*, No. 04-03467, ECF No. 35, at 22 (C.D. Cal. July 24, 2006) ("*Waxman II*") (Ex. 1) ("[W]hen defendant declined to produce documents in response to plaintiffs' § 2954 request, plaintiffs did not suffer a personal injury as that term is defined in *Raines*.  Rather, Congress, on whose behalf they acted, suffered institutional injury . . . . This is precisely the type of injury that, under *Raines*, deprives individual legislators of standing to sue.").  Plaintiffs filed a notice of appeal to the Ninth Circuit before voluntarily dismissing the appeal.  *See Waxman v. Thompson*, No. 06-56337, ECF No. 13 (9th Cir. Mar. 22, 2007) ("The appellants' letter dated March 14, 2007 is construed as a motion for voluntary dismissal and is granted.").

### III.    The Facts Of This Case

This case arises from the efforts of a minority of the members of the Oversight Committee[3] to obtain records concerning GSA's lease agreement with Trump Old Post Office, LLC.  On February 8, 2017, eight of the Committee's forty-two members wrote to GSA's Acting Associate Administrator, demanding (1) "monthly reports submitted to GSA by President Trump's company describing revenues and expenses"; (2) "copies of any correspondence from Trump Old Post Office LLC that provides notice of how it is addressing liens or documentation of any subsequent GSA action to resolve those liens"; (3) "copies of all correspondence with representatives of President Trump's company or the Trump transition team regarding the lease, the apparent breach of the lease, the monthly financial reports, the ownership structure of the Trump Old Post Office LLC, or any matters above"; and (4) copies of certain correspondence.  Letter from Hon. Elijah E. Cummings, *et al.*, to GSA (Feb. 8, 2017) (Ex. 3); *see also* Compl., ECF No. 1, ¶ 4.[4]

On June 5, 2017, eighteen members of the Committee wrote to Acting Administrator Horne.  This letter requested the same general items requested in the February 8 letter, as well as the following items:  (1) "all correspondence with representatives of the Trump Old Post Office LLC, the Trump Transition team, or the Trump Administration regarding compliance with the lease before or after the presidential election, Section 37.19 of the lease, the monthly financial reports, the structure of the trust created to address Section 37.19 of the lease, or any other matters

---

[3] There are forty-two members of the committee.  *See* House Committee on Oversight and Government Reform:  Full Committee, https://oversight.house.gov/subcommittee/full-committee.

[4] The Court may consider these and similar documents referenced in the complaint without converting Defendant's motion to dismiss into a motion for summary judgment.  *See, e.g.*, *Slate v. Pub. Def. Serv.*, 31 F. Supp. 3d 277, 287 (D.D.C. 2014) ("Courts have considered documents attached to motions to dismiss and opposition papers without converting the motion into one for summary judgment when the documents were referenced in the Complaint and were central to the plaintiff's claims.").

above";  (2) "all correspondence relating to funds received from any foreign country, foreign

entity, or foreign source"; (3) "all correspondence and documents relating to representatives of the

tenant in its interactions with GSA"; (4) all documents containing legal interpretations of Section

37.19 of the lease created within GSA or received from the tenant"; (5) "any legal opinion relied

upon by GSA in making a determination regarding the President's compliance with Section

37.19"; and (6) all drafts of a March 23, 2017, letter from Kevin Terry.  Letter from Hon. Elijah

E. Cummings, *et al.*, to GSA (June 5, 2017) (Ex. 4); *see also* Compl. ¶ 25.  On July 6, 2017, the

same eighteen members of the Committee wrote to Acting Administrator Horne, indicating that,

"[i]f we do not receive a written response by July 20, 2017, we will have no option but to conclude

that GSA has made the decision not to respond to our inquiry, and we will consider other options

to enforce the Seven Member Rule."  Letter from Hon. Elijah E. Cummings, *et al.*, to GSA (July

6, 2017) (Ex. 5); *see also* Compl. ¶ 26.

On July 17, 2017, the Associate Administrator of GSA wrote to the members of the

Committee.  The letter indicated that "GSA intends to respond to all congressional inquiries," but

"for oversight requests" referred the Committee members to a letter from the Office of Legal

Counsel concluding that "the constitutional authority to conduct oversight . . . may be exercised

only by each chamber of Congress or, under existing delegations, by committees and

subcommittees (or their chairmen).  Letter from GSA to Members of Congress (July 17, 2017)

(Ex. 6); *see also* Comp. ¶ 27; Office of Legal Counsel, Letter Opinion for Counsel to the President,

Authority of Individual Members of Congress to Conduct Oversight of the Executive Branch

(2017), https://www.justice.gov/olc/file/966326/download.

Notwithstanding the Executive Branch's legal position, it has made clear that it is

committed to honoring congressional requests for information where possible.  On July 20, 2017,

the White House Director of Legislative Affairs wrote to Senator Charles Grassley, explaining that the OLC letter "provides legal advice" but "does not set forth administration policy." *See* Letter from Marc Short, Director of Legislative Affairs, The White House, to Sen. Charles E. Grassley, 1 (July 20, 2017), https://www.judiciary.senate.gov/imo/media/doc/2017.07.20%20WH-Short %20Response%20to%20CEG%20re%20Oversight.pdf. The White House underscored that "the Executive Branch should voluntarily release information to individual Members where possible, even though individual Members cannot by themselves legally compel such release." *Id.* Consistent with that commitment, Defendant intends to treat the requests at issue here as though they were submitted under the Freedom of Information Act and respond to them accordingly.

Plaintiffs commenced this action by filing a complaint on November 2, 2017. *See generally* Compl. Plaintiffs contend that Defendant's failure to provide the information that they seek frustrates their ability to "evaluate the propriety" of GSA's alleged failure to enforce the lease, *id.* ¶ 36(a); "evaluate GSA's oversight of the lease, including financial management of the lease," *id.* ¶ 36(b); "ascertain the amount of income from the lease benefiting" the President and his family, *id.* ¶ 36(c); "determine the extent to which Trump Old Post Office LLC has received funds from foreign countries, foreign entities, or other foreign sources," *id.* ¶ 36(d); "assess whether GSA's failure to act is based on a new interpretation of Article 37.19 of the lease," *id.* ¶ 36(e), "evaluate whether the GSA contracting officer's decision that the Trump Old Post Office LLC is in compliance with the lease was free from inappropriate influence," *id.* ¶ 36(f); and "recommend to the Committee, and to the House of Representatives, legislative and other actions that should be taken to cure any existing conflict of interest, mismanagement, or irregularity in federal contracting," *id.* ¶ 36(g). Plaintiffs seek a declaration and order compelling Defendant to comply with their request under the mandamus statute, *see* 28 U.S.C. § 1361; the All Writs Act, *see* 28

U.S.C. § 1651; the Administrative Procedure Act, *see* 5 U.S.C. §§ 701 *et seq.*; and the Declaratory

Judgment Act, *see* 28 U.S.C. §§ 2201-2202.  *See generally* Compl. ¶ 6.

## STANDARD OF REVIEW

Under Rule 12(b)(1), a plaintiff seeking to invoke the jurisdiction of a federal court bears

the burden of establishing that the court has jurisdiction to hear his claims.  *See U.S. Ecology, Inc.*

*v. U.S. Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000).  As relevant here, a plaintiff's lack of

constitutional standing is "a defect in subject matter jurisdiction."  *Haase v. Sessions*, 835 F.2d

902, 906 (D.C. Cir. 1987).  Because the elements necessary to establish jurisdiction are "not mere

pleading requirements but rather an indispensable part of the plaintiff's case, each element must

be supported in the same way as any other matter on which the plaintiff bears the burden of proof,

*i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Under Rule 12(b)(6), a plaintiff must allege "sufficient factual matter, accepted as true, to

'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim has facial plausibility

"when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged."  *Id.*  Thus, a "pleading that offers 'labels

and conclusions' or 'a formulaic recitation of the elements of a cause of action'" does not state a

claim.  *Id.* (quoting *Twombly*, 550 U.S. at 555).

## ARGUMENT

## I.    Plaintiffs, As Individual Legislators, Lack Standing To Sue For Injuries To Congress's Institutional Interests.

As the only court to address the question has held, Plaintiffs' attempt to enforce 5 U.S.C.

§ 2954 fails for lack of standing under the Supreme Court's decision in *Raines v. Byrd*:  Plaintiffs

cannot individually vindicate the institutional rights of the House of Representatives.  *See Waxman II*  (Ex. 1) at 22 ("[W]hen defendant declined to produce documents in response to plaintiffs' § 2954 request, plaintiffs did not suffer a personal injury as that term is defined in *Raines*.").[5]

Article III's narrow limits on federal court jurisdiction are "founded in concern about the proper — and properly limited — role of the courts in a democratic society."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  Indeed, the Supreme Court has explained that "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)).  Plaintiffs must thus show they have standing as a "predicate to any exercise of [this Court's] jurisdiction," *Fla. Audubon Soc'y v. Bentsen,* 94 F.3d 658, 663 (D.C. Cir. 1996), and the "'irreducible constitutional minimum' of standing contains three elements: (1) injury-in-fact, (2) causation, and (3) redressability."  *Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1207 (D.C. Cir. 2013) (quoting *Lujan*, 504 U.S. at 560-61).  As this Court has observed, principles of Article III standing require a court to "put aside the natural urge to proceed directly to the merits" and instead "carefully inquire as to whether [plaintiffs] have met their burden of establishing that their claimed injury is personal, particularized, concrete, and otherwise judicially cognizable."  *State of W. Va. v. U.S. Dep't of Health & Human Servs.*, 145 F. Supp. 3d 94, 110 (D.D.C. 2015) (Mehta,

---

[5] *Waxman I* is not to the contrary.  As explained above, *Waxman I* reached no holding on standing because it believed that the defendants had waived their standing challenge.  *See Waxman II* at 16 n.34 (*Waxman I* "did not address the legislators' standing to sue").  That conclusion is irreconcilable with the ample Supreme Court precedent indicating that challenges to subject matter jurisdiction, including standing, cannot be waived.  *See, e.g.*, *United States v. Hays*, 515 U.S. 737, 742 (1995); *United States v. Corrick*, 298 U.S. 435, 440 (1936).  In any event, the district court order was vacated after the Ninth Circuit held that the release of the documents under FOIA had rendered the parties' dispute moot.  *See generally supra* Background Part II.B.

J.), *aff'd sub nom.*, *W. Va. ex rel. Morrissey v. U.S. Dep't of Health & Human Servs.*, 827 F.3d 81

(D.C. Cir. 2016) (quoting *Raines*, 521 U.S. at 820).

A.   *Raines v. Byrd*

*Raines* was a challenge by six members of Congress to the Line Item Veto Act, which gave

the President the authority to cancel spending provisions in an appropriations bill without vetoing

the bill in its entirety.  That statute specifically provided that "[a]ny Member of Congress or any

individual adversely affected by [this Act] may bring an action, in the United States District Court

for the District of Columbia, for declaratory judgment and injunctive relief on the ground that any

provision of this part violates the Constitution."  *Raines*, 521 U.S. at 815-16 (quoting 2 U.S.C.

§ 692(a)(1) (1996)); *see generally Waxman II* (Ex. 1) at 10 (describing *Raines*).  Invoking that

provision, the *Raines* plaintiffs argued that the act had injured them by "alter[ing] the legal and

practical effect of [their] votes . . . on bills containing . . . vetoable items," by "divest[ing] [them]

of their constitutional role in the repeal of legislation," and by "alter[ing] the constitutional balance

of powers between the Legislative and Executive Branches."  *Raines*, 521 U.S. at 816 (citation

omitted).

The Supreme Court held that the plaintiffs lacked standing.  The Court stressed that, under

Article III, the plaintiff's injury must be "personal," to ensure "that he has a 'personal stake' in the

alleged dispute."  *Raines*, 521 U.S. at 818-19 (citations omitted).  But the plaintiffs in *Raines* "d[id]

not claim that they ha[d] been deprived of something to which they *personally* [were] entitled."

*Id.* at 821.  Rather, the injuries they asserted — alteration of the legal and practical effect of their

votes in Congress — constituted a form of institutional injury, "a loss of political power, not loss

of any private right," which stemmed exclusively from their status as members of Congress.  *Id.*

Thus, their injury was "not claimed in any private capacity but solely because they [were] Members

of Congress."  *Id.*  As the Court elaborated:

> If one of the Members were to retire tomorrow, he would no longer have a claim; the claim would be possessed by his successor instead.  The claimed injury thus runs (in a sense) with the Member's seat, a seat which the Member holds (it may quite arguably be said) as trustee for his constituents, not as a prerogative of personal power.

*Id.*; *see also, e.g.*, *Comm. on Judiciary v. Miers*, 558 F. Supp. 2d 53, 69 (D.D.C. 2008) (describing *Raines*:  "[T]he asserted injury actually ran to the *institution* of Congress, not to the individual Members who brought suit.  Put another way, the Members had suffered no injury that granted them *individual* standing because the actual injury was incurred by the *institution.*").

Having concluded that the plaintiffs had alleged "no injury to themselves as individuals," the Court determined that the injury that the plaintiffs had asserted in their capacity as members of Congress (what the Court referred to as "institutional injury") was inadequate.  *See* 521 U.S. at 821-26, 829.  In only one prior case, the Court observed, had it "upheld standing for legislators . . . claiming an institutional injury."  *Id.* at 821. The Court construed that case, *Coleman v. Miller*, 307 U.S. 433 (1939), as standing solely for the proposition that "legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been *completely nullified*."  *Raines*, 521 U.S. at 823 (emphasis added); *see also Waxman II* at 11 (discussing *Coleman*).  In contrast, the plaintiffs in *Raines* claimed that, as a result of the Line Item Veto Act, their votes on future appropriations bills would be "less 'effective' than before, and that the 'meaning' and "integrity' of their vote ha[d] changed."  *Id.* at 825.  The Court found "a vast difference between the level of vote nullification in *Coleman* and the abstract dilution of institutional legislative power" alleged in *Raines*, *id.* at 825-26, and concluded that the plaintiff legislators had not alleged an interest sufficient to establish Article III standing.

B.      **Under *Raines*, Plaintiffs Lack Standing.**

This case must be dismissed for lack of standing under *Raines*.  To have standing under *Raines*, members of Congress must either allege that they "have been deprived of something to which they personally are entitled," 521 U.S. at 821, or state an institutional injury "severe enough to meet *Coleman*'s strict 'complete nullification' standard."  *Kucinich v. Def. Fin. & Accounting Serv.*, 183 F. Supp. 2d 1005, 1009 (N.D. Ohio 2002); *see also Kucinich v. Bush*, 236 F. Supp. 2d 1, 5, 8 (D.D.C. 2002); *Walker v. Cheney*, 230 F. Supp. 2d 51, 66 (D.D.C. 2002).  Plaintiffs have done neither here.

1.      **Plaintiffs Are Not Personally Injured By Defendant's Failure To Produce The Documents They Demand.**

Legislators may have standing if "they have been deprived of something to which they personally are entitled — such as their seats as Members of Congress after their constituents had elected them."  *Raines*, 521 U.S. at 821; *see also Powell v. McCormack*, 395 U.S. 486, 496 (1969).  Plaintiffs, however, are not "personally entitled" to the information that they have demanded in this suit.  Rather, *Congress* has implicit constitutional authority to conduct inquiries and gather information in aid of its power to legislate, and it enacted 5 U.S.C. § 2954 to advance its institutional interests in evaluating the need for legislation, not the personal interests of its members.

When Plaintiffs seek information from the Executive Branch, they do so exclusively in their capacities as members of the Oversight Committee, in contemplation that they would request information for the benefit of the entire House, so that Plaintiffs and their colleagues may formulate enlightened judgments concerning the exercise of Congress's lawmaking powers.[6]    Any

---

[6] *See, e.g*, *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 126 (2011) ("The legislative power thus committed is not personal to the legislator but belongs to the people; the legislator has no personal right to it."); *McGrain v. Daugherty*, 273 U.S. 135, 158 (1927) ("The committee was

diminution in Plaintiffs' ability to perform their assigned role is thus "a type of institutional injury . . . which necessarily damages all Members . . . and both Houses of Congress equally." *Raines*, 521 U.S. at 821.  It is in no sense an injury personal to the individual Members.

The legislative history makes clear that the statute's purpose is to preserve "the right *of the House of Representatives*" to the information contained in the discontinued agency reports, H.R. Rep. No. 70-1757, at 6 (emphasis added), "upon its necessity becoming evident" to seven or more members of the Oversight Committee.  S. Rep. No. 70-1320, at 4.  The statute confers no rights upon individual legislators, and certainly none of a personal kind.  Consistent with the statutory purpose, all of the injuries that Plaintiffs allege derive from their status as members of Congress. *See, e.g.*, Compl. ¶ 36(g) (alleging injury to Plaintiffs' ability to "recommend to the Committee, and to the House of Representatives, legislative and other actions that should be taken to cure any existing conflict of interest, mismanagement, or irregularity in federal contracting").  As in *Waxman II*, such allegations make perfectly clear that Plaintiffs are attempting to sue on Congress's behalf, rather than as individuals.  *See Waxman II* (Ex. 1) at 14-15 ("Plaintiffs allege that defendant's failure to provide information impaired 'their ability to assess whether legislation [was] needed' . . . . They thus effectively concede that their request was in aid of their legislative duties rather than for any private purpose.").

Just as in *Raines*, if Plaintiffs retired from Congress tomorrow, they would no longer be entitled to request information under 5 U.S.C. § 2954; that right "would be possessed by [their] successor[s] instead."  *Raines*, 521 U.S. at 821; *see also Waxman II* at 20 ("[I]t is clear that plaintiffs' right to request and receive information from the executive branch pursuant to § 2954

---

acting for the Senate and under its authorization, and therefore the subpoenas which the committee issued . . . are to be treated as if issued by the Senate.").

would cease once they were no longer in Congress or no longer a member of the Oversight Committee.  In a very real sense, therefore, the right they assert runs with their congressional and committee seats, and is not personal to them."); *Kucinich*, 236 F. Supp. 2d at 7 ("Simply put, *Raines* teaches that generalized injuries that affect all members of Congress in the same broad and undifferentiated manner are not sufficiently 'personal' or 'particularized,' but rather are institutional, and too widely dispersed to confer standing.").  This demonstrates that they have not been personally injured by the conduct about which they complain.

### 2.    Plaintiffs' Alleged Institutional Injury Cannot Confer Standing.

Because Plaintiffs merely allege an injury in their capacity as members of Congress, they are asserting what *Raines* referred to as an "institutional injury."  Pursuant to *Raines*, however, individual legislators do not have standing to vindicate institutional interests unless, as in *Coleman*, "their votes have been completely nullified."  521 U.S. at 823; *see also Chenoweth v. Clinton*, 181 F.3d 112, 116-17 (D.C. Cir. 1999) ("Although *Coleman* could be interpreted more broadly, the *Raines* Court read the case to stand only for the proposition that 'legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect) on the ground that their votes have been completely nullified.'");[7] *Common Cause v. Biden*, 909 F. Supp. 2d 25, 26 (D.D.C. 2012)

---

[7] In *Chenoweth*, several Members brought suit to challenge a Presidential program after unsuccessful legislative efforts to prevent the program's implementation.  181 F.3d at 113.  The Members claimed that the President's establishment of the program through an Executive Order "deprived them of their constitutionally guaranteed responsibility of open debate and vote on issues and legislation" involving the program.  *Id.*  The D.C. Circuit held that the alleged injury to the Members' "authority as legislators" was "identical to the injury the Court in *Raines* deprecated as 'widely dispersed' and 'abstract.'"  *Id.* at 115 (quoting *Raines*, 521 U.S. at 816).  If, as in *Raines*, a statute that allegedly divests the Members of their "constitutional role in the legislative process" does not give them standing to sue, the D.C. Circuit reasoned, "then neither does an Executive Order that allegedly deprives congressmen of their right to participate and vote on legislation in a manner defined by the Constitution."  *Id.*  (quotations and alteration omitted).

("The D.C. Circuit has interpreted the *Coleman* exception to mean 'treating a vote that did not pass as if it had, or vice versa.'" (quoting *Campbell v. Clinton*, 203 F.3d 19, 22 (D.C. Cir. 2000)); *Waxman II* (Ex. 1) at 13 ("Plaintiffs read *Coleman* too broadly.  The *Raines* Court narrowly construed *Coleman* to apply *only to the nullification of legislators' votes*.").[8]

Plaintiffs have not alleged an impact on any votes they have or will cast.  Instead, they claim that Defendant's failure to provide certain information has adversely affected their ability to assess whether legislation is needed.  Their claim is thus not even that the effectiveness of their votes has been reduced, as in *Raines*, but that Congress's implied authority to gather information in aid of forming legislative judgments has been impaired.  Plaintiffs' asserted injury is thus at least one step removed from the claimed dilution of legislative power that *Raines* and following cases have consistently rejected as an inadequate basis for legislators' standing.  *See Waxman II* (Ex. 1) at 13 ("Because plaintiffs do not claim that defendant's failure to produce the requested documents nullified their *votes*, and assert only that they have been required to vote and legislate without full access to information, *Coleman* provides no basis for a finding that plaintiffs have standing to sue.").

*Coleman* is inapposite for another reason.  As the D.C. Circuit has observed, "the federal constitutional separation of powers concerns that underlay the [Supreme Court's] decision in *Raines* (and which [the D.C. Circuit] emphasized in *Chenoweth*) were not present in . . . *Coleman*." *Campbell*, 203 F.3d at 22; *see also Harrington v. Bush*, 553 F.2d 190, 205 n.67 (D.C. Cir. 1977) ("A separation of powers issue arises as soon as the *Coleman* holding is extended to United States legislators.").  This is a significant distinction.  In *Arizona State Legislature v. Arizona Independent*

---

[8] *See also Newdow v. U.S. Congress*, 313 F.3d 495, 499 (9th Cir. 2002); *Baird v. Norton*, 266 F.3d 408, 411-12 (6th Cir. 2001); *Alaska Legislative Council v. Babbitt*, 181 F.3d 1333, 1337-38 (D.C. Cir. 1999); *Kucinich*, 236 F. Supp. 2d at 7 & n. 7; *Kucinich*, 183 F. Supp. 2d at 1009.

*Redistricting Commission*, 135 S. Ct. 2652 (2015), the Supreme Court held that a state legislature had standing to challenge a state initiative that removed congressional redistricting authority from the state legislature. The Court reasoned that the initiative — which amended the state constitution — "would 'completely nullif[y]' any vote by the Legislature now or 'in the future,' purporting to adopt a redistricting plan." *Id.* at 2665 (quoting *Raines*, 521 U.S. at 823-24). In so holding, the Court emphasized that the case before it "does not touch or concern the question whether Congress has standing to bring a suit against the President" because "[t]here is no federal analogue to Arizona's initiative power," whereas "a suit between Congress and the President would raise separation-of-powers concerns." *Id.* at 2665 n.12.

As the district court noted in *Waxman II*, Judge Bates's decision in *Walker v. Cheney* is highly instructive. *See Waxman II* (Ex. 1) at 16 ("The most closely analogous case is *Walker v. Cheney*."). (The most closely analogous case now, of course, is *Waxman II* itself.) In *Walker*, the Comptroller General — an officer of the Legislative Branch with "broad authority to carry out investigations and evaluations for the benefit of Congress" — had begun an inquiry into the "conduct and composition" of the National Energy Policy Development Group chaired by the Vice President. 230 F. Supp. 2d at 53-55. The Office of the Vice President refused to disclose certain information. The Comptroller General filed suit to obtain the documents, invoking his statutory authority under 31 U.S.C. § 716(b)(2) to bring "a civil action in . . . [d]istrict [c]ourt . . . to require the head of [an] agency to produce a record." *Id.* at 54.

The court concluded that the Comptroller General lacked standing under *Raines*. It first determined that the Comptroller General had suffered no personal injury, because his interest in the documents related exclusively to his statutory responsibilities as Comptroller General. *See Walker*, 230 F. Supp. 2d at 66 ("Mr. Walker's interest in this dispute is solely institutional, relating

exclusively to his duties in his official capacity as Comptroller General of the United States. Although the Vice President's refusal to disclose the requested documents may have frustrated plaintiff in his efforts to fulfill his statutory role, plaintiff himself has no personal stake in this dispute.").  The court next determined that "[t]he institutional injury [the Comptroller General] suffer[ed] . . . [was] also insufficient to confer standing."  *Id.*  Although the Comptroller General sought to enforce "a statutory right to information," the court recognized that the Comptroller General was acting as an agent for Congress, exercising investigatory prerogatives delegated to him by Congress, and therefore his claim of injury must be evaluated in terms of the harm to Congress.  *Id.* at 66-67.  Because the Comptroller General sought the records at issue to "assist Congress in determining whether and to what extent future legislation, relating . . . to national energy policy or openness in government, may be appropriate," and in "conducting oversight of the executive branch's administration of existing laws," the alleged harm amounted at most to an impairment of Congress's general interests in lawmaking and oversight, an "abstract dilution of institutional legislative power" which was insufficient to confer standing.  *Id.* at 67-68 (quoting *Raines*, 521 U.S. at 826).

Judge Bates's analysis applies with full force here.  Just like the Comptroller General in *Walker*, Plaintiffs seek information in order to perform official functions.  *Compare Walker*, 230 F. Supp. 2d at 58 ("The Comptroller General alleges that he seeks such information . . . in order to aid Congress in considering proposed legislation, assessing the need for and merits of further legislative changes, and conducting oversight of the executive branch's administration of existing laws.") *with* Compl. ¶ 36-36(e) ("The deprivation of the information sought thwarts plaintiffs' ability to . . . recommend to the Committee, and to the House of Representatives, legislative and other actions that should be taken . . . .").  Plaintiffs seek to gather information, for Congress's

benefit, to "assist Congress in the discharge of its legislating and oversight functions."  *Walker*,

230 F. Supp. 2d at 67; *see also, e.g.*, *Common Cause*, 909 F. Supp. 2d at 25 ("[T]he House Member

Plaintiffs' votes are powers they exercise in their official capacities as House Members.  Just like

in *Raines*, those votes are not a personal entitlement.").  Any detriment resulting to that interest

when the Executive Branch withholds information is nothing more than an "abstract dilution of

institutional legislative power" and does not entail the complete nullification of their votes that is

essential to establish their standing under *Raines*.  521 U.S. at 826.[9]

Because the purported injury that Plaintiffs have suffered is institutional and widely

dispersed, Plaintiffs cannot proceed absent authorization of the House of Representatives.  To the

contrary, court after court has found that where a legislator plaintiff seeks to vindicate the interests

of the body in which he serves, he must obtain the authorization of that body.  *See Raines*, 521

U.S. at 829 (noting "that appellees have not been authorized to represent their respective Houses

of Congress in this action, and indeed both Houses actively oppose their suit."); *Ariz. State*

---

[9] To be sure, congressional committees have sometimes been held to have standing to litigate against the Executive Branch.  *See, e.g.*, *Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1, 14 (D.D.C. 2013); *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 67 (D.D.C. 2008).  As the district court explained in *Waxman II*, however, such suits bear no resemblance to this one.  *See Waxman II* (Ex. 1) at 20 ("Plaintiffs' suit cannot be compared to a subpoena enforcement suit brought by a committee or subcommittee of the House.  The House, or the Speaker when the House is not in session, must authorize such suits.  When a congressional committee sues to enforce a subpoena, it does so only after a resolution of the full House citing the witness for contempt.  This is necessary, the District of Columbia Circuit has observed, to prevent 'a wayward committee [from] acting contrary to the will of the House,' and to protect the witness from 'aberrant subcommittee or committee demands.'" (quoting *AT&T*, 551 F.2d at 393 & n.16)); *see also, e.g.*, *Holder*, 979 F. Supp. 2d at 7 (noting that "the Speaker of the House authorized the General Counsel of the House to initiate this action"); *Miers*, 558 F. Supp. 2d at 69-70 ("*Raines* and *AT&T I* are consistent. In *AT&T I*, the House intervened to defend its institutional interest in compliance with duly issued congressional subpoenas. Thus, the intervenor in *AT&T I* — the chairman of the subcommittee that had issued the subpoena — was authorized to act on behalf of the House to vindicate the House's institutional right that had been challenged by the executive branch.  The chairman, then, represented the institution." (emphasis omitted)).

*Legislature*, 135 S. Ct. at 2664 (distinguishing *Raines*: "The Arizona Legislature, in contrast, is an institutional plaintiff asserting an institutional injury, and it commenced this action after authorizing votes in both of its chambers."); *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 544 (1986) (school board member could not appeal on behalf of board when board itself declined to take such appeal); *Kerr v. Hickenlooper*, 824 F.3d 1207, 1215 (10th Cir. 2016) ("[A]lthough . . . *Arizona* did not expressly hold that only an institutional plaintiff possesses standing to assert an institutional injury, that much is implicit in the Court's opinion."); *House v. Burwell*, 130 F. Supp. 3d 53, 67 (D.D.C. 2015) ("But the plaintiff here is the House of Representatives, duly authorized to sue as an institution, not individual members as in *Raines*."); *Kucinich v. Obama*, 821 F. Supp. 2d 110, 118 (D.D.C. 2011) ("[T]he Supreme Court's decision in *Raines* was premised in part on the fact that the legislators in that case did not initiate their lawsuit on behalf of their respective legislative bodies."); *Campbell v. Clinton*, 52 F. Supp. 2d 34, 44 (D.D.C. 1999) ("the absence of any indication that the twenty-six plaintiffs have been authorized to represent those two-hundred and thirteen representatives — or even a substantial number of them — compels the conclusion that plaintiffs have no standing to raise these claims"), *aff'd*, 203 F.3d 19 (D.C. Cir. 2000); *U.S. House of Representatives v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76, 89 (D.D.C. 1998) (noting that the "House of Representatives has been granted authority by statute to prosecute this suit and to employ the services of outside counsel and other experts in so doing").   Plaintiffs cannot assert the institutional interests of the House of Representatives when the House of Representatives has not authorized their suit.

### 3.   Historical Practice

In holding that the plaintiffs in *Raines* lacked standing, the Supreme Court also relied on "historical practice" — "analogous confrontations" between the Legislative and Executive Branches where "no suit was brought on the basis of claimed injury to official authority or power,"

but which, had the courts entertained suit, doing so would have "plunged [the courts] into . . . bitter political battle[s] being waged between the President and Congress." *Raines*, 521 U.S. at 826-27.

There is no history or tradition that would support treating inter-Branch disputes over congressional requests for information as "Cases" or "Controversies" appropriate for resolution through the judicial process. *See Chenoweth*, 181 F.3d at 113-14 ("Historically, political disputes between Members of the Legislative and Executive Branches were resolved without resort to the courts."); *Walker*, 230 F. Supp. 2d at 71-72. Although the political Branches have struggled since the founding of the Republic over access to information, these inter-Branch disputes have nearly always been resolved not through judicial action, but through political pressure, negotiation, and compromise. Indeed, plaintiffs have "political tools with which to remedy their purported injury." *Campbell*, 203 F.3d at 24. Among the numerous means at Congress's disposal to obtain information from the Executive Branch are control over appropriations, powers of investigation, and the subpoena power, all of which ensure that courts are drawn into disputes of a political nature only on rare occasions of true institutional impasse between the Executive and Legislative Branches, rather than at the behest and expedience of individual Members of Congress. *See Campbell*, 52 F. Supp. 2d at 43 (citing *Goldwater v. Carter*, 444 U.S. 996, 997-98 (1979) (Powell, J., concurring)).

## II.    Plaintiffs Do Not Have A Cause Of Action Entitling Them To Judicial Enforcement Of 5 U.S.C. § 2954.

Even if Plaintiffs' lack of standing did not present an insurmountable constitutional obstacle at the very threshold of this litigation, the case would nevertheless be properly dismissed for want of a statutory right of action.

### A.     Plaintiffs Must Have A Statutory Right Of Action To Maintain This Suit.

Even if Plaintiffs had standing to vindicate rights created by 5 U.S.C. § 2954, that would

not mean that Plaintiffs have a cause of action to enforce those rights in federal court.  "[T]he fact

that a federal statute has been violated and some person harmed does not automatically give rise

to a private cause of action in favor of that person." *Touche Ross & Co. v. Redington*, 442 U.S.

560, 568 (1979); *accord, e.g.*, *Freedom Watch, Inc. v. Obama*, 807 F. Supp. 2d 28, 32 (D.D.C.

2011) ("For a cause of action to exist, a plaintiff must demonstrate that the statute under which it

is attempting to proceed reflects Congressional intent to create a private remedy.").  As the

Supreme Court has said, "private rights of action to enforce federal law must be created by

Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).  "[E]ven where a statute is phrased

in . . . explicit rights-creating terms," a plaintiff still must show that Congress has created for his

or her benefit "not just a private right, but also a private remedy." *Gonzaga Univ. v. Doe*, 536 U.S.

273, 284 (2002) (citation and emphasis omitted)).  As explained below, Plaintiffs have failed to

identify a cause of action through which they can litigate their claims under 5 U.S.C. 2954.[10]

### B.     5 U.S.C. § 2954 Does Not Create A Cause Of Action.

At the outset, 5 U.S.C. § 2954 does not create a cause of action, a proposition that Plaintiffs

do not appear to contest.  Indeed, the text of the statute makes no reference whatsoever to

enforcement at all, let alone a right of action to enforce its provisions in federal court.  *See Waxman*

*II* (Ex. 1) at 5 ("§ 2954 is silent on the issue of judicial enforcement"); *id.* at 21-22 ("§ 2954 does

---

[10] Plaintiffs contend that "[t]he federal courts have the power in appropriate circumstances to enjoin violations of federal law by federal officials independent of the APA." Compl. ¶ 34 (citing *Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378, 1384 (2015)).  The cited case, however, refers only to the "ability to sue to enjoin unconstitutional actions by state and federal officers." *Armstrong*, 135 S. Ct. at 1384.  Plaintiffs have not asserted any constitutional claims in this case, rendering *Armstrong* inapposite.

not address how a records request should be enforced if the official to whom it is directed fails to produce the documents sought."); *id.* at 21 n.42 ("[T]he language and legislative history of § 2954 do not reflect that Congress either anticipated or intended that members would seek to enforce its provisions judicially."); *see also* Rosenberg, Investigative Oversight, *supra*, at 44 ("[T]he provision lacks a compulsory component."); House *Waxman* Brief (Ex. 2) at 22 ("Section 2954 was never intended by Congress to be judicially enforceable, and . . . the courts should not now interpret the statute to permit a judicial remedy.").  Because neither the statute nor its legislative history manifests an intent on the part of Congress to create a right of action under 5 U.S.C. § 2954, it cannot be taken implicitly to allow one.  *Alexander*, 532 U.S. at 286.

**C.      Plaintiffs Lack A Cause Of Action Under The APA.**

The APA recognizes a cause of action for persons "suffering legal wrong because of agency action," or who are "adversely affected or aggrieved by agency action within the meaning of a relevant statute."  5 U.S.C. § 702.  The agency actions subject to judicial review are "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court."  *Id.* § 704.  In a case within its jurisdiction, a reviewing court is empowered, among other things, to "compel agency action unlawfully withheld."  *Id.* § 706(1).

As explained below, Plaintiffs cannot proceed under the APA.  At the outset, the APA does not apply when judicial review is precluded.  *See* 5 U.S.C. § 701(a)-(a)(1) ("This chapter applies, according to the provisions thereof, except to the extent that . . . statutes preclude judicial review.").  And even if judicial review were not precluded, failing to turn over information to Congress is not agency action within the meaning of the APA.

**1.      APA Review Is Precluded By Statute.**

At the outset, Plaintiffs cannot proceed under the APA because judicial review is precluded by 5 U.S.C. § 2954 itself, along with the panoply of statutes governing congressional access to

information.   "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved."   *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984).   Congressional intent to preclude review "may also be inferred from . . . the collective import of legislative and judicial history behind a particular statute."   *Id.* at 349 (citing *Heikkila v. Barber*, 345 U.S. 229 (1953)).   In short, APA review is unavailable "whenever the congressional intent to preclude judicial review is fairly discernible . . . in the detail of the legislative scheme."   *Id.* at 350-51; *see also, e.g.*, *United States v. Fausto*, 484 U.S. 439, 452 (1988).

5 U.S.C. § 2954 is utterly silent about enforcement; it says nothing whatsoever suggesting that it was intended to create a role for courts in policing disputes between individual legislators and the Executive Branch.   An intent to preclude review can be "fairly discern[ed]" not only from that silence, but also from the "collective import of legislative and judicial history" of the entire statutory scheme governing congressional requests for information, of which 5 U.S.C. § 2954 is a part.   *Block*, 467 U.S. at 349, 351.   "In particular, . . . when a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded."   *Id.* at 349.

As summarized above, Congress has adopted specific statutes to enforce requests for information through the subpoena process.   Under that regime, once the House or Senate authorizes enforcement of a subpoena, it must certify the matter for the commencement of judicial action to the appropriate United States Attorney.   2 U.S.C. § 194; *see id.* § 192.   Similarly, under House Rules, committees and subcommittees may issue subpoenas calling for the production of documents, but only when authorized by the committee or subcommittee itself, or (if permitted by

committee rules) the committee chair.  House Rule XI, § 2(m)(1) & (3)(A).  A subpoena "may be enforced *only* as authorized or directed by the House" (or the Speaker of the House if Congress is not in session), *id.* § 2(m)(3)(C) (emphasis added); *see Wilson*, 369 F.2d at 203, again pursuant to statutes requiring the House to certify its directive to the appropriate U.S. Attorney for prosecution, not to file an enforcement action of its own.  2 U.S.C. § 194.

This scheme — including both the detailed provisions governing the enforcement of subpoenas and the absence of such provisions as to 5 U.S.C. § 2954 — supplies no basis to believe that "it was nevertheless the legislative judgment" that a demand for information, advanced by as few as seven members of one specified committee, could be laid directly before the courts for enforcement without the scrutiny or endorsement of their colleagues in the House at large, or even their fellow committee members.  *Block*, 467 U.S. at 347.  To the contrary, given the express provision within this complex scheme for judicial enforcement of congressional subpoenas, "the omission of [similar] provision[s]" for judicial enforcement of requests under 5 U.S.C. § 2954 is "sufficient reason to believe that Congress intended to foreclose" such actions.  *Id.* at 346-47; *see also, e.g.*, *Dellums v. Smith*, 797 F.2d 817, 823 (9th Cir. 1986) (private citizens lack right of action under the APA to challenge Attorney General's decision not to conduct preliminary investigation under the Ethics in Government Act, where Congress envisioned enforcement by congressional judiciary committees, not private citizens).[11]

---

[11] As noted above, when 5 U.S.C. § 2954 was enacted, it was already the "customary" and "established practice" of Congress to rely on these means of enforcement to vindicate its rights of access to evidence and information, in light of which the Supreme Court presumed, in *Reed*, that a special Senate investigatory committee did not have power to sue to enforce one of its subpoenas absent a "specific[] grant[]" of such authority.  277 U.S. at 388-89.  And in the eighty years since 5 U.S.C. § 2954 was enacted, legislators have made no attempt, until *Waxman I*, to bring suit to enforce its provisions.  That history is another "powerful indication" that the statute is not judicially enforceable.  *See FTC v. Bunte Bros., Inc.*, 312 U.S. 349, 351-52 (1941) ("[T]he want of assertion of power by those who presumably would be alert to exercise it[] is . . . significant in determining

Permitting individual legislators to sue the Executive Branch under 5 U.S.C. § 2954, without the authorization of their colleagues, "would severely disrupt [Congress's] complex and delicate . . . scheme" for subpoena enforcement by providing small numbers of legislators "a convenient device for evading . . . [the institutional and] statutory requirement[s]" that they persuade their colleagues of the wisdom and necessity of bringing such action before drawing the courts into these disputes. *See Block*, 467 U.S. at 348.  Allowing individual members of Congress to use the courts to resolve these controversies with the Executive Branch without regard to — indeed, in derogation of — the views of the House majority would render the longstanding procedures by which Congress may seek to compel production of information from the Executive Branch completely superfluous.  "Congress is unlikely to intend [such] radical departures from past practice without making a point of saying so."  *Jones v. United States*, 526 U.S. 227, 234 (1999); *accord, e.g.*, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions — it does not, one might say, hide elephants in mouseholes."); House *Waxman* Brief at 22 (Ex. 2) ("It is almost impossible to imagine that Congress would have intended, in passing Section 2954, to so radically change the dynamic of executive-legislative disputes over information access — and to change it to Congress's own detriment.").

5 U.S.C. § 2954 is deafeningly silent about judicial review, or enforcement of any sort, and the legislative history describes the statute as nothing more than a mundane bureaucratic improvement over the routine reporting requirements that the Act of May 29, 1928 abolished.  *See supra* Background Part I.  There is nothing suggesting that Congress viewed the statute as a new

---

whether such power was actually conferred."); *see also BankAmerica Corp. v. United States*, 462 U.S. 122, 131 (1983) ("[T]he Government's failure for over 60 years to exercise the power it now claims . . . strongly suggests that it did not read the statute as granting such power.").

mechanism for resolving Congress's disputes with the Executive Branch over access to information, or that it meant, for the first time, to permit small numbers of legislators to precipitate judicial confrontation with the Executive Branch without the endorsement or authority of Congress as a whole (or at least one House of Congress).  The import of that silence must be to preclude APA litigation that "would effectively nullify" the scheme for subpoena enforcement on which Congress has relied for nearly 150 years.  *See Block*, 467 U.S. at 348.

Finally, the conclusion that Congress did not intend judicial review of claims arising under 5 U.S.C. § 2954 is buttressed by additional statutes forming the legislative backdrop to that section. For example, Congress has authorized the Congressional Research Service and the Congressional Budget Office to request information from Executive Branch agencies.  In neither case, however, do the authorizing statutes refer to judicial action to enforce those requests.  *See* 2 U.S.C. §§ 166(d), 601(d).  In contrast, Congress not only authorized the Comptroller General to request information of Executive Branch agencies, 31 U.S.C. § 716(a), but also expressly purported to authorize the Comptroller General to bring civil actions to compel agencies to produce any records withheld in response to such requests, *id.* § 716(b)(2).  Similarly, Congress has expressly purported to authorize the Senate Legal Counsel to bring civil actions to enforce subpoenas issued by the Senate or its committees, but "only when directed to do so" by resolution of the Senate, 2 U.S.C. §§ 288b(b), 288d(a), and with exceptions for authorized assertions of governmental privileges.  28 U.S.C. § 1365(a).

The upshot is that when Congress wants to authorize judicial enforcement of Legislative Branch requests for information in the possession of the Executive Branch, it knows how to do so. The omission of any statutory provision for enforcement of requests presented under 5 U.S.C. § 2954 compels the conclusion that Congress never meant disputes over these requests to be settled

in court.  *Cf. Switchmen's Union of N. Am. v. Nat'l Mediation Bd.*, 320 U.S. 297, 305-06 (1943)

(where Congress provides for judicial review in a "highly selective manner . . . it dr[aws] a plain

line of distinction"); *see also Block*, 467 U.S. at 347.

> **2.      Withholding Information Does Not Constitute Agency Action That Is Reviewable Under The APA.**

Even if judicial review were not precluded, Plaintiffs would still be unable to proceed under

the APA.  The APA permits judicial review over "[a]gency action made reviewable by statute and

final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.

Agency action is defined to include "the whole or a part of an agency rule, order, license, sanction,

relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).  As numerous

courts have held, an executive branch report to Congress is not agency action under this definition.

Rather, when an agency responds (or does not) to a statutory request for information, it is not

exercising power delegated to it by Congress, but is instead answering to an exercise by Congress

of its legislative authority over the agency.  *See, e.g.*, *Guerrero*, 157 F.3d at 1195 ("By the same

token, the report is not agency action of the sort that is typically subject to judicial review.");

*American Trucking Assoc. v. United States*, 755 F.2d 1292, 1296 (7th Cir. 1985) (agency reports

do not constitute "agency action" under Administrative Procedure Act because they do not change

law or policy); *Chem. Weapons Working Grp., Inc. v. U.S. Dep't of the Army*, 111 F.3d 1485, 1495

(10th Cir. 1997) ("Construing the agency action challenged as the Secretary of Defense's

certification to Congress that testing was complete is similarly unhelpful" in identifying agency

action); *Nat. Res. Def. Council v. Lujan*, 768 F. Supp. 870, 882 (D.D.C. 1991) ("As defendant-

intervenors correctly point out, the Report was not explicitly or implicitly intended as anything

more than a vehicle to inform Congress.  It is for Congress, not the courts, to determine if the

Report satisfies the statutory requirements it enacted."); *see also Taylor Bay Prot. Ass'n v. EPA*,

884 F.2d 1073, 1081 (8th Cir. 1989); *Greenpeace USA v. Stone*, 748 F. Supp. 749, 765-66 (D. Haw. 1990), *appeal dismissed as moot*, 924 F.2d 175 (9th Cir. 1991).

That an agency's failure to provide information on demand would not be reviewable under the APA makes sense when Title 5 of the U.S. Code is read as a whole.  As originally enacted in 1946, the Administrative Procedure Act provided that "[a]ny person suffering legal wrong because of any agency action" could seek judicial review, *see* Pub. L. No. 79-404, § 10(a), 60 Stat. 237, 243 (1946) (codified as amended at 5 U.S.C. § 702), and it defined agency action to include "failure to act," *id.* § 2(g) (codified at 5 U.S.C. § 551(13)).  Yet when Congress enacted the Freedom of Information Act in 1966, it enacted a specific provision providing that district courts "shall have jurisdiction to enjoin the agency from the withholding of agency records and to order the production of any agency records improperly withheld from the complainant."  Pub. L. No. 89-487, § 3(c), 80 Stat. 250, 251 (codified as amended at 5 U.S.C. § 552(a)(4)(B)).  This language would be pure surplusage if the failure to turn over records on demand already constituted reviewable agency action under the APA, *contra Asiana Airlines v. FAA*, 134 F.3d 393, 398 (D.C. Cir. 1998) ("A cardinal principle of interpretation requires us to construe a statute 'so that no provision is rendered inoperative or superfluous, void or insignificant.'" (quoting *C.F. Commc'ns Corp. v. FCC*, 128 F.3d 735, 739 (D.C. Cir. 1997)).  Nor can Plaintiffs explain why other reporting provisions that contemplate judicial involvement would explicitly say so if the APA stood as a catch-all backstop.[12]  *See generally supra* Part II.C.1.

---

[12] The Government in the Sunshine Act likewise contains a cause of action for enforcement that is not dependent on meeting the APA's definition of agency action.  *See* 5 U.S.C. § 552b(h)(1).

**D.**      **Plaintiffs Cannot Proceed Under The Declaratory Judgment Act.**

Plaintiffs also cannot proceed under the Declaratory Judgment Act. The Declaratory Judgment Act "presupposes the existence of a judicially remediable right," *Schilling v. Rogers*, 363 U.S. 666, 677 (1960); in other words, it does not create a cause of action. *See Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011) ("Nor does the Declaratory Judgment Act (DJA) provide a cause of action. It is a well-established rule that the Declaratory Judgment Act is not an independent source of federal jurisdiction. Rather, the availability of declaratory relief presupposes the existence of a judicially remediable right." (quoting *C&E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth.*, 310 F.3d 197, 201 (D.C. Cir. 2002) (additional citations and alterations omitted)); *Metz v. BAE Sys. Tech. Sols. & Servs. Inc.*, 774 F.3d 18, 25 n.8 (D.C. Cir. 2014) (same); *Doe v. U.S. Parole Comm'n*, 602 F. App'x 530, 532 n.3 (D.C. Cir. 2015) (same).[13]

_____

[13] This court has repeatedly applied this principle. *See Glenn v. Thomas Fortune Fay*, 222 F. Supp. 3d 31, 35 (D.D.C. 2016) ("A declaratory action under § 2201 is not a separate cause of action, but rather a prayer for relief."); *Malek v. Flagstar Bank*, 70 F. Supp. 3d 23, 28 (D.D.C. 2014) ("[A] count for a declaratory judgment is not cognizable as a separate cause of action, but is more properly included in the prayer for relief." (alterations omitted)); *Intelsat USA Sales Corp. v. Juch-Tech, Inc.*, 935 F. Supp. 2d 101, 120 (D.D.C. 2013) (same); *Walpin v. Corp. for Nat'l. & Cmty. Serv.*, 718 F. Supp. 2d 18, 24 (D.D.C. 2010) (same); *Mohamed v. Select Portfolio Servicing, Inc.*, 215 F. Supp. 3d 85, 97 (D.D.C. 2016) ("The Act does not, however, provide a stand-alone cause of action; it only authorizes a form of relief."); *Bridges v. Blue Cross & Blue Shield Ass'n*, 935 F. Supp. 37, 45 (D.D.C. 1996); *Detroit Int'l Bridge Co. v. Gov't of Canada*, 133 F. Supp. 3d 70, 88 (D.D.C. 2015) ("[T]he Declaratory Judgment Act does not provide a cause of action . . . although it does authorize a form of relief for properly-pled actions." (citation omitted)), *amended on denial of reconsideration*, 189 F. Supp. 3d 85 (D.D.C. 2016); *United States v. Instruments, S.A.*, 807 F. Supp. 811, 814 (D.D.C. 1992) ("When a complaint seeks declaratory relief . . . there must be a basis for federal jurisdiction independent of the Declaratory Judgment Act itself. . . . But the plaintiff must also raise a federal claim, for the Declaratory Judgment Act does not create a cause of action." (emphasis omitted)); *Seized Prop. Recovery, Corp. v. U.S. Customs & Border Prot.*, 502 F. Supp. 2d 50, 64 (D.D.C. 2007) ("Although Plaintiff purports to bring this claim under the Declaratory Judgment Act, it does not specify any cause of action *through which* the Court may exercise subject matter jurisdiction and grant declaratory relief."); *Superlease Rent-A-Car, Inc. v. Budget Rent-A-Car of Md., Inc.*, No. 89-0300, 1989 WL 39393, at *3 (D.D.C. Apr. 13, 1989) ("[T]he Declaratory Judgment Act . . . provides no independent cause of action. The plaintiff must

### E.       Plaintiffs Cannot Seek A Writ Of Mandamus Under The All Writs Act.

Plaintiffs likewise cannot proceed under the mandamus statute and the All Writs Act, *contra* Compl. ¶ 32.  Mandamus relief is appropriate only if a plaintiff has a clear right to relief, the defendant has a clear duty to act, and there is no other adequate remedy available to the plaintiff.  *PDK Labs, Inc. v. Reno*, 134 F. Supp. 2d 24, 34 (D.D.C. 2001).  Mandamus jurisdiction "is strictly confined. . . . Mandamus is drastic; it is available only in extraordinary situations; it is hardly ever granted; those invoking the court's mandamus jurisdiction must have a clear and indisputable right to relief."  *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc) (citations omitted).  The duty "to be performed by the agency must be ministerial and the obligation to act peremptory, and clearly defined.  The law must not only authorize the demanded action, but require it; the duty must be clear and indisputable."  *PDK Labs*, 134 F. Supp. 2d at 34.  A ministerial duty "is one that admits of no discretion, so that the official in question has no authority to determine whether to perform the duty."  *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996).  "[E]ven if the plaintiff overcomes all these hurdles, whether mandamus relief should issue is discretionary."  *Cheney*, 406 F.3d at 729.

At the outset, Plaintiffs cannot seek a writ of mandamus for the same reason that they cannot pursue any of their other claims for relief:  they lack standing and judicial review is precluded.  Indeed, ample authority provides that when judicial review is precluded, that preclusion applies equally to a request for a writ of mandamus.  As the Ninth Circuit has explained in declining to issue a writ of mandamus where judicial review was precluded, "[i]t would frustrate the Congressional scheme . . . if exclusive jurisdiction could be thwarted by a party's

---

assert an interest in itself, *which the law recognizes.* In other words, the plaintiff must first have a cognizable cause of action . . . .").

characterization of the nature of the lawsuit." *Columbia Power Trades Council v. Dep't of Energy*, 671 F.2d 325, 328-29 (9th Cir. 1982); *see also, e.g.*, *Estate of Michael ex rel. Michael v. Lullo*, 173 F.3d 503, 506 (4th Cir. 1999) (Mandamus Act does not override statute that limits jurisdiction); *In re Blackwater Sec. Consulting, LLC*, 460 F.3d 576, 593 (4th Cir. 2006) (similar); *Ross v. United States*, 460 F. Supp. 2d 139, 150 (D.D.C. 2006) (similar, collecting authority).

In any event, 5 U.S.C. § 2954 does not provide a "clear and compelling duty" owed by Defendant to Plaintiffs. Even under Plaintiffs' construction, to ascertain whether the statute applies in any given case it still must be determined whether the information requested relates to matters "within the jurisdiction" of the Oversight Committee. Moreover, confronted with a request under 5 U.S.C. § 2954, a responding agency would have to make numerous judgments about the extent of the records search to be conducted, the responsiveness of documents to the inquiries made, and possible concerns regarding Executive Branch confidentiality interests or assertions of privilege, actions which would each depend in their execution on the nature of the request submitted. The extent of these obligations in any given case is hardly "free from doubt," and their execution by no means "ministerial;" they do not entail "a specific, affirmative action."

Finally, even if the acts alleged by Plaintiffs represented a violation of Defendant's ministerial duties as a general matter, they do not represent a violation of such duties owed *to the Plaintiffs. See* 28 U.S.C. § 1361 ("The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed *to the plaintiff*." (emphasis added)); *cf., e.g.*, *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 162 (1803) ("Mr. Marbury, then, since his commission was signed by the President, and sealed by the secretary of state, was appointed; and as the law creating the office, gave the officer a right to hold for five years, independent of the executive, the appointment was

not revocable; but vested in the officer legal rights, which are protected by the laws of this country.").[14]  Instead, as described above, any duties created under 5 U.S.C. § 2954 are owed to the House of Representatives as a whole.

## III.   The Court Should Decline To Hear This Case Under Principles Of Equitable Discretion.

Even if Plaintiffs had standing to sue based on Congress's institutional interests, and even if Plaintiffs had judicially enforceable rights under 5 U.S.C. § 2954, this suit would still be properly dismissed under the doctrine of equitable discretion.   That doctrine holds that "[w]hen constitutional disputes arise concerning the respective powers of the Legislative and Executive Branches, judicial intervention should be delayed until all possibilities for settlement have been exhausted."  *United States v. House of Representatives*, 556 F. Supp. 150, 152 (D.D.C. 1983); *see also AT&T*, 551 F.2d at 394.  The doctrine also holds that Courts should refrain from hearing cases involving intra-Branch disputes "[w]here a congressional plaintiff could obtain substantial relief from his fellow legislators through the enactment, repeal, or amendment of a statute." *Riegle v. Fed. Open Market Comm.*, 656 F.2d 873, 881 (D.C. Cir. 1981).  The doctrine thus prevents courts

---

[14] Indeed, in adopting the language in 28 U.S.C. § 1361 that the governmental official must owe a duty "to the plaintiff," Congress specifically considered and rejected proposals to extend Section 1361 to the enforcement of duties more broadly.  *See* S. Rep. No. 87-1992, at 1 (1962) (proposing to make mandamus relief available to enforce "a duty owed to the plaintiff or to make a decision in any matter involving the exercise of discretion").  Byron White, then the Deputy Attorney General, criticized this proposal on behalf of the Department of Justice:  "We think it essential that the section . . . specifically limit its exercise to ministerial duties owed [*to*] *the plaintiff*.  Should the language be applied to discretionary acts of Federal officers, the judicial branch would be invading the executive or legislative function in violation of the doctrine of separation of powers."  *Id.* at 6 (emphasis added); *see also* 108 Cong. Rec. 20,079 (1962).  The mandamus statute ultimately enacted by Congress followed the Deputy Attorney General's advice. *See* Pub. L. No. 87-748, 76 Stat. 744 (1962); *see also* 108 Cong. Rec. 20,093 (1962) ("The Senate amendment makes it clear that the duty must be one owed to the plaintiff.").

from interfering in affairs of Congress "which properly could, and should, [be] decided by appeal to one's fellow legislators." *Gregg v. Barrett*, 771 F.2d 539, 545 (D.C. Cir. 1985).

These separation-of-powers considerations compel the dismissal of this suit. The request at issue was made by a minority of the Oversight Committee. Rather than convince a majority of their House colleagues of a need for this information, they seek relief from the courts. Whether this case is viewed as a dispute between Plaintiffs and their colleagues in the House, or a dispute between Plaintiffs and GSA, Plaintiffs should direct their appeals to their fellow legislators, *Riegle*, 656 F.2d at 881, and, if they succeed in persuading their colleagues to subpoena the materials that they seek, judicial action should thereafter await the exhaustion of all possibilities for settlement. *House of Representatives*, 556 F. Supp. at 152.

## IV. Should The Court Reach The Merits, 5 U.S.C. § 2954 Does Not Apply.

Finally, should the Court reject the foregoing arguments and reach the merits, 5 U.S.C. § 2954 does not apply to the information that Plaintiffs demand in this suit. Interpreting the statute to require submission of virtually any information in an agency's files on request of seven members of a committee would raise serious constitutional concerns. Under that construction, an agency in possession of material deemed sensitive for national security, law enforcement, or other reasons would have no choice but to make the requested disclosure. This unrestrained power is one that not even Congress as a whole may assert. *See, e.g.*, *Barenblatt v. United States*, 360 U.S. 109, 111-12 (1959) (Congress's power to investigate is not without limitations, and Congress "cannot inquire into matters . . . within the exclusive province of one of the other branches of the Government," nor "supplant the Executive in what exclusively belongs to the Executive."); *Senate Select Comm. v. Nixon*, 498 F.2d 725, 733 (D.C. Cir. 1974) (committee's need for information was "too attenuated and too tangential to its functions" to permit enforcement of subpoena issued to the President).

These concerns cannot be dismissed by observing that executive privilege could defeat overreaching demands by legislators for information.  The Supreme Court has admonished that "[e]xecutive privilege is an extraordinary assertion of power not to be lightly invoked," which "pushes to the fore difficult questions of separation of powers and checks and balances." *Cheney v. U.S. Dist. Court for the Dist. of Columbia*, 542 U.S. 367, 389 (2004).  Plaintiffs' interpretation of 5 U.S.C. § 2954 invites such "constitutional confrontation between the two branches," occasions that "should be avoided whenever possible." *Id.* at 389-90.

It is axiomatic that "where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, [a court's] duty is to adopt the latter." *Jones v. United States*, 529 U.S. 848, 857 (2000). This canon of construction "reflects the prudential concern that constitutional issues not be needlessly confronted," *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988), a reluctance that "is especially great where, as here, [the questions presented] concern the relative powers of coordinate branches of government." *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 466 (1989).

Fortunately, 5 U.S.C. § 2954 is susceptible of a construction that avoids doubt as to its constitutionality.  As noted above, the House and Senate reports demonstrate that the statute was intended only to preserve access to the sort of information included in the reports abolished by the 1928 Act.  *See* S. Rep. No. 70-1320, at 4; H.R. Rep. No. 70-1757, at 6.  In light of this history, both the Executive Branch and the Congressional Research Service have long understood 5 U.S.C. § 2954 to allow access only to the information that had previously been included in the discontinued reports.  Almost fifty years ago, then-Assistant Attorney General William Rehnquist explained before Congress that the statute's "purpose was to serve as a vehicle for obtaining

information theretofore embodied in the annual routine reports to Congress submitted by the several agencies," and that the statute means only that "the types of annual reports, the requirement of submission to Congress of which was discontinued by section 1 of the 1928 statute can nonetheless be selectively demanded by any seven members of the committee if they wish them." 117 Cong. Rec. 42,966 (1971). Then-Assistant Attorney General Antonin Scalia later similarly testified that 5 U.S.C. § 2954 "did not represent a Congressional judgment that . . . a minority should have the power to demand all information, but rather only the information which was formerly contained in annual reports which the Congress abolished." *Executive Privilege — Secrecy in Gov't: Hearings before Subcomm. on Intergovernmental Relations of the S. Comm. on Gov't Operations*, 94th Cong. 107 (1975) (statement of Assistant Attorney General Scalia). Any other construction, he explained, would be of "questionable constitutionality." *Id.* The Congressional Research Service has also observed that the purpose of 5 U.S.C. § 2954 "was not to assert a sweeping right of congress to obtain any information it might desire from the executive branch," but instead that the "scope of 5 U.S.C. § 2954 is closely tied to the 128 reports abolished by section 1 of the 1928 legislation." Rosenberg, Investigative Oversight, *supra*, at 44; *see also* Congressional Research Service, RL30240, *supra*, at 69 ("[T]he precise scope and efficacy of this provision is uncertain and a recent federal district court opinion cases [sic] doubt on its enforceability by a court.").

It thus bears underscoring that Plaintiffs are asking this Court to adopt an interpretation that is of dubious constitutionality, is contrary to the longstanding interpretation of both the Executive and Legislative Branches, and (with the exception of the vacated order in *Waxman I*) has never been adopted by any court. This Court should reject that invitation and embrace the narrower and far less constitutionally suspect understanding of the statute's reach. *See, e.g.*, *Jones*,

529 U.S. at 857; *Pub. Citizen*, 491 U.S. at 466-67 (rejecting literal construction of statute that would have raised separation-of-powers concerns, based on legislative history suggesting a narrower reading).  Because Plaintiffs do not contend that the information contained in the agency reports that Congress abolished in 1928 included the materials that they demand here, they cannot state a claim for violation of the statute.

## CONCLUSION

Defendant respectfully requests that her motion be granted and that this case be dismissed with prejudice.

Dated:  January 8, 2018                    Respectfully submitted,

                                           CHAD A. READLER
                                           Acting Assistant Attorney General

                                           JESSIE K. LIU
                                           U.S. Attorney for the District of Columbia

                                           ELIZABETH J. SHAPIRO
                                           Deputy Director, Federal Programs Branch

                                           /s/ *Steven A. Myers*
                                           STEVEN A. MYERS (NY Bar No. 4823043)
                                           Trial Attorney
                                           Federal Programs Branch
                                           U.S. Department of Justice, Civil Division
                                           Telephone:  (202) 305-8648
                                           Fax:  (202) 616-8460
                                           Email:  Steven.A.Myers@usdoj.gov

                                           Mailing Address:
                                           Post Office Box 883
                                           Washington, DC 20044

                                           Courier Address:
                                           20 Massachusetts Ave., NW Rm. 7334
                                           Washington, DC 20001

                                           *Counsel for Defendant*