EXHIBIT 2

1 GERALDINE R. GENNET
2 General Counsel

3 KERRY W. KIRCHER
4 Deputy General Counsel

5 DAVID PLOTINSKY
6 Assistant Counsel

7 CHRISTINE M. DAVENPORT
8 Assistant Counsel

9 JOHN D. FILAMOR
10 Assistant Counsel

11 Office of General Counsel
U.S. House of Representatives
12 219 Cannon House Office Building
13 Washington, D.C. 20515-6532
14 Telephone: (202) 225-9700
Facsimile: (202) 226-1360
15

16 Attorneys for Amicus Curiae
Bipartisan Legal Advisory Group of
17 the U.S. House of Representatives

18

19          **IN THE UNITED STATES DISTRICT COURT**
             **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
20                      (Western Division)

21

22 HENRY A. WAXMAN, *et al.,*              No. CV-04-03467 MMM (MANx)

23          Plaintiffs,                     **AMICUS CURIAE BRIEF OF**
                                            **THE BIPARTISAN LEGAL**
24          v.                              **ADVISORY GROUP OF THE**
                                            **UNITED STATES HOUSE OF**
25 TOMMY G. THOMPSON, Secretary            **REPRESENTATIVES IN**
      of Health and Human Services,        **SUPPORT OF DEFENDANT'S**
26                                          **MOTION TO DISMISS OR IN**
            Defendant.                      **THE ALTERNATIVE FOR**
27                                          **SUMMARY JUDGMENT**

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................iii

STATEMENT OF INTEREST...........................................................1

BACKGROUND...............................................................................3

    I.  Congressional Access to Executive Branch Information Generally...........3

    II.  Section 2954.......................................................................6

ARGUMENT....................................................................................10

    I.  The Absence of Any Provision for a Cause of Action
        in Section 2954 Indicates That It Is Not Judicially Enforceable..............10

    II.  The Legislative History of Section 2954, and Existing House
        Mechanisms for Obtaining Executive Branch Information,
        Demonstrate That  Section 2954 Was Not Intended to Be
        Judicially Enforceable.............................................................14

        A. Nothing in the Legislative History of Section 2954
             Indicates That It Was Intended to Be Judicially Enforceable.......14

        B. Existing Congressional Mechanisms for Compelling
            the Production of Executive Branch Information Also Suggest
            That Congress Did Not  Intend That Section 2954 Would Be
            Judicially Enforceable.............................................................15

    III.  Judicial Enforcement of Section 2954 Would Conflict With the
         Reluctance of the Courts to Intervene in Information Access
          Disputes Between the Legislative and Executive Branches...................22

CONCLUSION.................................................................................25

# TABLE OF AUTHORITIES

**Statutes:**

2 U.S.C. § 166(d).................................................................................24

2 U.S.C. § 192....................................................................................18

2 U.S.C. § 194....................................................................................19

5 U.S.C. § 2954.............................................................................*passim*

31 U.S.C. § 716(a).........................................................................10, 13

42 Stat. 26 (1921)...............................................................................10

**Cases:**

Anderson v. Dunn,
     19 U.S. (6 Wheat) 204 (1821).........................................................18

Barenblatt v. United States,
     360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959)........................19

Braden v. United States,
     365 U.S. 431, 81 S.Ct. 584, 5 L.Ed.2d 653 (1961)...........................19

Dep't of Commerce v. United States House of Representatives,
     525 U.S. 316, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999)......................15

Gojack v. United States,
     384 U.S. 702, 86 S.Ct. 1689, 16 L.Ed.2d 870 (1966)........................18

In re Beef Industry Antitrust Litigation,
     589 F.2d 786 (5th Cir. 1979)..........................................................17

Jones v. United States,
     526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999).....................15

iii

*McDonald v. City of West Branch, Michigan*, 466 U.S. 284,
    104 S.Ct. 1799, 80 L.Ed.2d 302 (1984)........................................................10

*McGrain v. Daugherty*,
    273 U.S. 135, 47 S.Ct. 319, 71 L.Ed. 580 (1927)........................................16

*United States v. AT&T*,
    567 F.2d 121 (D.C. Cir. 1977)................................................................23-24

*United States v. House of Representatives of the United States*,
    556 F.Supp. 150, (D.D.C. 1983)..........................................................20, 23

*Walker v. Cheney*,
    230 F.Supp.2d 51 (D.D.C. 2002)..............................................................13

*Waxman v. Evans*,
    No. CV014530LGB(AJWX),
    2002 WL 32377615 (C.D. Cal. Jan. 18, 2002)............................................9

*Waxman v. Evans*,
    52 Fed.Appx. 84 (9th Cir. 2002)................................................................9

*Wilkinson v. United States*,
    365 U.S. 399, 81 S.Ct. 567, 5 L.Ed.2d 633 (1961)....................................18

*Wilson v. United States*,
    369 F.2d 198, 203-04 (D.C. Cir. 1966)....................................................19

**Secondary Sources:**

Stanley M. Brand & Sean Connelly, *Constitutional Confrontations:
Preserving a Prompt and Orderly Means by Which Congress May
Enforce Investigative Demands Against Executive Branch Officials*, 36
Cath. U. L. Rev. 71, 77-83 (1986)...........................................................20

Wm. Holmes Brown, *House Practice: A Guide to the Rules, Precedents
and Procedures of the House* 799, 104th Cong., 2d Sess. (1996)...........................16

iv

Joel D. Bush, *Congressional-Executive Access Disputes: Legal Standards and Political Settlements*, 9 J. L. & Pol. 719, 724 (1993)..........................................4

Archibald Cox, *Executive Privilege*, U. Pa. L. Rev. 1383, 1397 n.54 (1974)...........7

Neal Devins, *Congressional-Executive Information Access Disputes: A Modest Proposal – Do Nothing*, 48 Admin. L. Rev. 109 (1996).............................19

Louis Fisher, *Congressional Access to Legislative Branch Information: Legislative Tools*, CRS Report for Congress (200)........................................2, 3, 20

John C. Grabow, *Congressional Investigations: Law and Practice* 20 (1988).........3

Robert Kramer & Herman Marcuse, *Executive Privilege - A Study of the Period 1953-1960 (Part I)*, 29 Geo. Wash. L. Rev. 623 (1960)..............................9

Robert Kramer & Herman Marcuse, *Executive Privilege – A Study of the Period 1953-1960 (Part II)*, 29 Geo. Wash. L. Rev. 827 (1961)...........................11

Randall K. Miller, *Congressional Inquests: Suffocating the Constitutional Prerogative of Executive Privilege*, 81 Minn. L. Rev. 631 (1997)..........................20

Walter J. Oleszek, *Congressional Procedures and the Policy Process* (4th ed. 1996).......................................................................................................16

Todd D. Peterson, *Prosecuting Executive Branch Officials for Contempt of Congress*, 66 N.Y.U. L. Rev. 563 (1991)...........................................................6, 20

Morton Rosenberg, *Investigative Oversight: An Introduction to the Law, Practice and Procedure of Congressional Inquiry*, CRS Report for Congress (1995).......................................................................................................18

Mark J. Rozell, *Executive Privilege: The Dilemma of Secrecy and Democratic Accountability* (1994)...........................................................................4

Peter M. Shane, *Negotiating for Knowledge: Administrative Responses to Congressional Demands for Information*, 44 Admin. L. Rev. 197 (1992).............13

v

Herman Wolkinson, *Demands of Congressional Committees for Executive Papers*, (Parts I, II and III), 10 Fed. B.J. 103 (1949)................................................7

**Legislative Materials:**

3 Annals of Congress 493 (Mar. 27, 1792)..............................................................3

Chris Cannon, 6 *Cannon's Precedents of the House of Representatives*, §§ 434-35 (1936)..............................................................................................17

17 Cong. Rec. 2211 (1886)......................................................................................6

69 Cong. Rec. 10613 (May 29, 1928 (statement of Sen. Sackett)........................14

94 Cong. Rec. 5700-5743, 5807-5822 (1948).........................................................7

Lewis Deschler, 4 *Deschler's Precedents of the House of Representatives*, ch. 15, § 2, 3, 5.3 (1977)............................................................................4, 6, 17

Lewis Deschler, 7 *Deschler's Precedents of the House of Representatives*, ch. 24, § 8 (1977)..................................................................................................16

Asher C. Hinds, 2 *Hind's Precedents of the House of Representatives*, §§ 1509-13, 1518-19, 1534, 1561.............................................................................17.

Asher C. Hinds, 3 *Hind's Precedents of the House of Representatives*, §§ 1856, 1884, 1894 (1907)..........................................................................3, 4, 6

H.R. Rep. No. 1595, pt. I, 80th Cong., 2d Sess. (1948)..........................................6

H.R. Rep. No. 1757, 70th Cong., 1st Sess. (1928)................................................14

Congressional Research Service, *History of the U.S. House of Representatives, 1789-1994*, H.R. Doc. No. 103-324 (1994) ................................1-2

vi

*Availability of Information from Federal Departments and Agencies, Hearings Before the Subcomm. on Government Information of the House Committee on Government Operations*, 85th Cong., 2d Sess. 1-3916 (1958)..................................................................................8, 11

GAO "Memorandum on Right of Comptroller General and the General Accounting Office to Have Access to the Records of the Emergency Loan Guarantee Board" (Sept. 21, 1971), *reprinted in Refusals by the Executive Branch to Provide Information to the Congress, 1964-1973, A Survey Conducted by the Subcomm. on the Separation of Powers of the Senate Comm. on the Judiciary*, 93rd Cong., 2d Sess. at 143-51, 255-87 (1974)...........................9

S. Rep. No. 1320, 70th Cong., 1st Sess. 4 (1928)....................................14

*Strengthening Comptroller General's Access to Records: New Procedure for Appointment, Hearings before the Legislation and National Security Subcomm. of the House Comm. on Government Operations*, 95th Cong., 2d Sess. 15 (May 17 and June 26, 1978)...............................................12

*The Power of the President to Withhold Information from the Congress, Memorandums of the Attorney General Compiled by the Subcomm. on Constitutional Rights of the Senate Comm. on the Judiciary*, 85th Cong., 2d Sess. 74 (Comm. Print 1958)............................................................7, 8

*Withholding of Information by Department of Agriculture, Hearing before the Subcomm. on Intergovernmental Relations of the House Comm. on Government Operations*, 85th Cong., 2d Sess. 4-5 (1958) ......................................9

**House Rules:**

Rule XI(2)(m) of the Rules of the U.S. House of Representatives (108th Cong.)...............................................................................17

Rule XI(2)(m)(3)(A)(i) of the Rules of the U.S. House of Representatives (108th Cong.)...............................................................................17

Rule XI(2)(m)(3)(C) of the Rules of the U.S. House of Representatives (108th Cong.)...............................................................................17

Rule XIII(7) of the Rules of the U.S. House of Representatives (108th Cong.).....16

## STATEMENT OF INTEREST

The Bipartisan Legal Advisory Group of the United States House of Representatives presents the institutional position of the House in litigation matters.[1] The House has a strong interest in this case because if this Court finds that 5 U.S.C. § 2954 is judicially enforceable, the ability of the legislative branch to obtain information from the executive branch may be severely harmed.  Although it is well-established that each House of Congress has the power to issue and enforce compulsory process to obtain information needed for legislative purposes, the legislative and executive branches have vigorously disagreed as to how this power extends to obtaining information from the executive branch.  This question has been frequently debated on the floor of the House and Senate, has been the subject of countless congressional hearings and has been extensively debated by constitutional scholars and other legal experts.

This debate, however, has taken place almost entirely outside the judicial arena. While "the executive has resisted House and Senate attempts to obtain information on numerous occasions,"[2] such disputes have generally been resolved through political negotiation and accommodation.  Congress has legislative tools available to pressure the executive to produce information.  For example, Congress "has sought to compel

---

[1] The Group consists of the Honorable J. Dennis Hastert, Speaker of the House; the Honorable Tom DeLay, Majority Leader; the Honorable Nancy Pelosi, Minority Leader; the Honorable Roy Blunt, Majority Whip; and the Honorable Steny Hoyer, Minority Whip.  The Minority Leader and the Minority Whip declined to support the filing of this brief.

[2] Congressional Research Service, *History of the U.S. House of Representatives, 1789-1994*, H.R. Doc. No. 103-324, at 234 (1994) (printed under the supervision of the Committee on House Administration) [hereinafter "*House History*"].

1

compliance through threats to withhold funding from the agency or operation in question and through resolutions of inquiry directing officials to supply specific information."[3]  Where informal demands were unsuccessful, congressional committees have issued subpoenas, voted to hold executive officials in contempt, and submitted contempt reports to the full House for consideration.  These actions have generally resulted in Congress obtaining the information it sought, although "[s]ometimes Congress has had to compromise with the executive to end such disputes, for instance, by scaling back the initial request and accepting less information more quickly."[4]

If Section 2954 were judicially enforceable, however, such disputes could be readily presented for judicial resolution, which would radically change the manner in which executive-legislative information access disputes are resolved.  Making Section 2954 judicially enforceable would allow small groups of members within one committee to bring suit without the authorization of the House or its leadership, which would conflict with House Rules designed to maintain institutional control over the House's investigatory authority.  Without such institutional control, the courts, rather than the House, would decide what information is needed for legislative purposes, and the House's ability to resolve information access disputes without resort to litigation would be severely curtailed.

We wish to make it clear that, while we support the Motion to Dismiss, or, in the alternative, the Motion for Summary Judgment, of the Secretary of Health and Human Services, we do so solely based on the ground that Congress must be able to control the

[3] *Id.* at 235; *see also* Louis Fisher, *Congressional Access to Legislative Branch Information: Legislative Tools*, CRS Report for Congress (2001) at 5-11, 13-18 (describing instances in which the appropriations and appointment powers were used to compel the executive to produce information to Congress).

[4] *House History, supra,* at 235.

2

manner in which it obtains from the executive information Congress needs to fulfill its legislative and oversight functions.  We do not endorse the longstanding position of the executive branch that it has wide discretion to withhold information properly requested by the House or its committees, and we do not necessarily endorse any other specific arguments made by the Secretary.

## BACKGROUND

### I.    Congressional Access to Executive Branch Information Generally

"From its earliest days the House has exercised its right to call on the President and the heads of Departments for information."[5]  In 1792, the House established an investigating committee to inquire into a failed military campaign by General St. Clair against Indian tribes in Ohio.  The House empowered the committee "to call for such persons, papers, and records, as may be necessary to assist their inquiries."[6]  This committee requested documents relating to the St. Clair expedition.

President Washington assembled his cabinet to advise him as to how to respond to this request.  As reflected by Thomas Jefferson's notes, the cabinet reached the following conclusions:

> First, that the House was an inquest and therefore might institute inquiries.  Second, that they might call for papers generally.  Third, that the Executive ought to communicate such papers as the public good would permit, and ought to refuse those, the disclosure of which would endanger the public. Fourth, that neither the committee nor the House had a right to call on the Head of a department, who and whose papers were under the President alone, but that the committee should instruct their chairman to move the House to address the President.[7]

---

[5] 3 Asher C. Hinds, *Precedents of the House of Representatives* § 1856 (1907).

[6] 3 Annals of Congress 493 (Mar. 27, 1792) (quoted in Fisher, *supra*, at 3).

[7] John C. Grabow, *Congressional Investigations: Law and Practice* 20 (1988).

3

Although President Washington did not utilize the asserted prerogative of withholding documents with respect to the St. Clair investigation, he did so on later occasions. In 1794, when the Senate requested diplomatic correspondence between the United States and France, President Washington refused to produce those parts of the correspondence that, based on "public considerations, ought not . . . be communicated."[8] In 1796, President Washington refused a request from the House for documents relating to John Jay's negotiation of a treaty with Great Britain.[9]

Successor administrations also claimed a right to withhold information from Congress based on the "public interest."[10] President Jackson, for example, "did not shy away from exercising, on numerous occasions, the presidential power to withhold information."[11]

These assertions of executive power often led to major battles with Congress. For example, in 1842, "the House vigorously asserted and President Tyler as vigorously denied the right of the House to all papers and information in possession of the Executive relating to subjects over which the jurisdiction of the House extended."[12]

---

[8] Mark J. Rozell, *Executive Privilege: The Dilemma of Secrecy and Democratic Accountability* 34-35 (1994).

[9] *Id.* at 35.

[10] *See id.* at 36-42 (discussing administrations from John Adams to Grover Cleveland); 4 Lewis Deschler, *Precedents of the House of Representatives*, ch. 15, § 3 (1977); Joel D. Bush, *Congressional-Executive Access Disputes: Legal Standards and Political Settlements*, 9 J. L. & Pol. 719, 724 (1993) ("[P]ractically every administration since 1792 has clashed with Congress over whether the President, at his discretion, may withhold information requested by the legislative branch.").

[11] Rozell, *supra*, at 38.

[12] 3 Hinds, *Precedents of the House of Representatives* § 1884.

4

Supporting the refusal of his Secretary of War to provide the House with certain investigative reports, President Tyler maintained that confidential information in the possession of the President and the heads of the Departments could be withheld from Congress in the discretion of the executive. *Id.* § 1885. President Tyler's message was referred to a House committee, which submitted a report in response. The committee acknowledged that some information and papers in the executive branch were properly treated as confidential, but asserted that "the House has the right to inspect them; and it, and not the executive, is to be the judge of the propriety of making them public." *Id.*

Another major conflict occurred in 1886 during the first administration of President Cleveland, when the Senate's demand for all papers in the Department of Justice relating to the removal of a U.S. Attorney was refused by the Attorney General. *Id.* § 1894. The matter was referred to the Judiciary Committee, which reported that, where papers were "unconditionally demanded" of the President or the heads of the Departments, "they were under a constitutional duty and obligation to furnish to either House the papers called for." *Id.* Further, "[i]t may be fully admitted that except in respect of the Department of the Treasury there is no statute which commands the head of any Department to transmit to either House of Congress on its demand any information whatever concerning the administration of his Department, but the committee believes it to be clear that from the very nature of the powers intrusted by the Constitution to the two Houses of Congress it is a necessary incident that either House must have at all times the right to know all that officially exists or takes place in any of the Departments of the Government." *Id.* After a lengthy debate, the Senate adopted a resolution condemning the Attorney General's refusal to provide the documents as "in violation of his official duty and subversive of the fundamental

5

principles of the Government and of a good administration thereof."[13]

These disputes, and many others like them, "were resolved through negotiation, without recourse to the courts."[14] Thus, for example, the House ultimately did receive most of the papers it sought from President Tyler[15], while the Senate did not receive the papers it sought from the Cleveland administration.[16]

## II.    Section 2954

Section 2954 was enacted in 1928 as part of a bill designed to simplify and streamline various executive branch reporting requirements.  It does not appear that Section 2954 had any other impact in the years that followed its enactment.  There is no evidence that either the House or Senate Committee on Expenditures in the Executive Department relied on this provision in information access disputes with the executive branch, nor that either committee enjoyed an advantage over other congressional committees in obtaining executive branch information.

On the contrary, in 1948 the House Committee on Expenditures declared that "[t]he practice of the Executive in denying to congressional committees information sought by those committees has gradually widened in scope," and cited examples of information withheld from its subcommittees.[17]  As a remedy, the Committee recommended legislation that would explicitly criminalize executive withholding of

---

[13]   17 Cong. Rec. 2211 (1886).

[14]   Todd D. Peterson, *Prosecuting Executive Branch Officials for Contempt of Congress*, 66 N.Y.U. L. Rev. 563, 570 (1991).

[15]   3 Hinds, *supra*, at § 1885.

[16]   *Id.* at § 1894.

[17]   H.R. Rep. No. 1595, pt. I, 80th Cong., 2d Sess. at 2 (1948); *see* 4 Deschler, *supra*, at ch. 15, § 5.3.

information from congressional committees.  During the lengthy debate on this controversial measure, there was no mention of Section 2954, much less any suggestion that it provided a mechanism to compel executive branch compliance with legislative demands for information.[18]

Problems with executive branch withholding of information continued, and, if anything, intensified, during the 1950s.  Typical was President Eisenhower's May 17, 1954 directive to the Secretary of Defense, ordering him not to permit any employees to testify before a subcommittee of the Senate Committee on Government Operations[19] regarding internal deliberations and communications, and a supporting memorandum from the Attorney General declaring that the President and the heads of the departments have "an uncontrolled discretion to withhold the information and papers in the public interest."[20]  This was followed by the Attorney General's submission to a Senate committee on April 10, 1957 of a lengthy Department of Justice memorandum supporting this alleged "uncontrolled discretion."[21]  This

---

[18] 94 Cong. Rec. 5700-5743, 5807-5822 (1948).

[19] The House and Senate Committees on Government Operations were the successors to the Committees on Expenditures.

[20] *The Power of the President to Withhold Information from the Congress, Memorandums of the Attorney General Compiled by the Subcomm. on Constitutional Rights of the Senate Comm. on the Judiciary*, 85th Cong., 2d Sess. 74 (Comm. Print 1958) [hereinafter *"The Power of the President to Withhold Information from the Congress"*].

[21] *Id.* at 1-72.  Although this was apparently the first formal release of this memorandum, it was initially drafted much earlier by a Department of Justice attorney, who published a law review article containing this analysis in 1949.  *See* Herman Wolkinson, *Demands of Congressional Committees for Executive Papers*, (Parts I, II and III), 10 Fed. B.J. 103, 223, 319 (1949); *see also* Archibald Cox, *Executive Privilege*, U. Pa. L. Rev. 1383, 1397 n.54 (1974).

7

memorandum explicitly addressed Section 2954, stating the view that the "Constitution and the manner in which the decisions cited have interpreted it, would entirely negate an intent or desire by Congress, entirely unexpressed in the legislative history of the bill, to compel heads of departments to surrender information or papers against the wishes of the President, or their own better judgment, and against the public interest."[22]

Although the Eisenhower Administration's position on withholding of information from the legislature engendered widespread congressional opposition and condemnation, there appears to have been little or no reaction to its position with respect to Section 2954.  A subcommittee of the House Committee on Government Operations held sixteen sets of hearings on executive withholding of information from November 1955 to November 1958, during which it heard testimony from numerous agencies and agency counsel, congressional lawyers, independent legal experts and others, yet there was apparently no challenge to the executive branch position on Section 2954, nor any suggestion of enforcing the statute through a lawsuit.[23]

During the Eisenhower administration and the administrations that followed, executive agencies withheld, on numerous occasions, information requested by the House and Senate Committees on Government Operations (and successor

---

[22] *The Power of the President to Withhold Information from the Congress*, *supra*, at 58.

[23] *Availability of Information from Federal Departments and Agencies*, *Hearings Before the Subcomm. on Government Information of the House Committee on Government Operations*, 85th Cong., 2d Sess. 1-3916 (1958) [hereinafter "*Moss Hearings*"].

8

committees).[24]  Although there have been occasional instances where these committees or individual members thereof have relied on Section 2954 as a basis for requesting information,[25] there has not been,  prior to *Waxman v. Evans*[26] and this case, any attempt by these committees or their members to judicially enforce the statute.

These attempts to make Section 2954 judicially enforceable represent a departure that is not supported by the language or history of the statute, and if successful this attempt would severely impair Congress's ability to get information

---

[24]  *See* GAO "Memorandum on Right of Comptroller General and the General Accounting Office to Have Access to the Records of the Emergency Loan Guarantee Board" (Sept. 21, 1971), *reprinted in Refusals by the Executive Branch to Provide Information to the Congress, 1964-1973, A Survey Conducted by the Subcomm. on the Separation of Powers of the Senate Comm. on the Judiciary*, 93rd Cong., 2d Sess. at 143-51, 255-87 (1974) [hereinafter "*Executive Branch Refusals 1964-1973*"];  Robert Kramer & Herman Marcuse, *Executive Privilege - A Study of the Period 1953-1960 (Part I)*, 29 Geo. Wash. L. Rev. 623, 635-37, 643, 650-53, 655-80 (1960) (describing numerous instances of information withheld from these committees during the 1953-60 time period).

[25]  *See, e.g., Withholding of Information by Department of Agriculture, Hearing before the Subcomm. on Intergovernmental Relations of the House Comm. on Government Operations*, 85th Cong., 2d Sess. 4-5 (1958) (request for information by the chairman of subcommittee pursuant to Act of 1928).  In 1994, eleven members, including Representatives Clinger and Hastert, relied upon the Act of 1928 in requesting information from the FDIC.

[26]  In *Waxman v. Evans*, the plaintiffs requested adjusted census data from the Secretary of Commerce pursuant to Section 2954, and sued when the Secretary refused to provide the information.  The district court ordered release of the requested census data.  *Waxman v. Evans*, No. CV014530LGB(AJWX), 2002 WL 32377615 (C.D. Cal. Jan. 18, 2002).  The United States Court of Appeals for the Ninth Circuit vacated the lower court's decision because the matter had been mooted by a FOIA case which resulted in the release of the census information at issue.  *Waxman v. Evans*, 52 Fed.Appx. 84 (9th Cir. 2002).

from the executive branch.

## ARGUMENT

I.   **The Absence of Any Provision for a Cause of Action in Section 2954 Indicates That It Is Not Judicially Enforceable.**

It is significant that Section 2954 is simply devoid of any provision making it judicially enforceable, which in itself is a strong indication that information access disputes under the statute should not be taken to court. *Cf. McDonald v. City of West Branch, Michigan*, 466 U.S. 284, 290, 104 S.Ct. 1799, 1803, 80 L.Ed.2d 302, 308 (1984) ("Because § 1983 creates a cause of action, there is, of course, no question that Congress intended it to be judicially enforceable."). The lack of judicial enforceability in Section 2954 can perhaps best be demonstrated by comparing and contrasting that provision with the information access statute for the General Accountability Office ("GAO"), a legislative agency under the direction of the Comptroller General.

As enacted in 1921 as part of the Budget and Accounting Act, the GAO statute originally provided:

> All departments and establishments shall furnish to the Comptroller General such information regarding the powers, duties, activities, organization, financial transactions, and methods of business of their respective offices as he may from time to time require of them; and the Comptroller General, or any of his assistants or employees, when duly authorized by him, shall, for the purpose of securing such information, have access to and the right to examine any books, documents, papers, or records of any such department or establishment.

42 Stat. 26 (1921); *see* 31 U.S.C. § 716(a). Despite this broad language, executive agencies frequently denied GAO access to records requested. For example, in 1958 the Secretary of the Air Force denied GAO copies of an Inspector General report

10

relating to the management of a ballistic missile program, claiming that GAO's statutory authority could not prevent the head of a department from exercising the executive branch's constitutional prerogative "to keep appropriate information confidential in the public interest."[27]  GAO rejected this contention and the House Committee on Government Operations, which held hearings on the matter, threatened to use the appropriations power to enforce GAO's right of access.[28]

Another controversy involved GAO's efforts to obtain from the executive branch certain internal reports evaluating the foreign aid programs in various countries.  After GAO was denied these reports on a number of occasions, a subcommittee of the House Government Operations Committee held a hearing and demanded the evaluation reports.[29]  This demand was again refused.  Congress then enacted legislation which specifically required that such reports be produced to the GAO or to any congressional committee or subcommittee upon request.  President Eisenhower signed the bill, but asserted in his signing statement that the bill was "not intended to alter and cannot alter the recognized Constitutional duty and power of the executive with respect to the disclosure of information, documents and other materials."[30]  This statement, which the sponsor described as "nullifying the amendment solemnly adopted by the Congress,"[31] led to repeated efforts to enact

---

[27]  *Moss Hearings, supra,* at 3675.

[28]  *Id.,* at 3695-96.

[29]  *See* Robert Kramer & Herman Marcuse, *Executive Privilege – A Study of the Period 1953-1960 (Part II)*, 29 Geo. Wash. L. Rev. 827, 847-50 (1961).

[30]  *Id.* at 855.

[31]  *Id.* at 856.

legislation which would make funding of foreign aid programs dependent on full information being given to GAO and congressional committees.[32]

GAO strenuously opposed these and other denials of information, contending that the executive branch's claimed "privilege to withhold information where such action is deemed necessary in the best interest of the country" could not overcome "GAO's clear statutory right of access to such information."[33]  However, GAO acknowledged that "[w]ith regard to enforcement remedies that are available to GAO to compel disclosure by Federal agencies where such agencies have refused to cooperate, except to report such refusals to Congress GAO does not have any enforcement remedies available."[34]

As a consequence, legislation was introduced in the 1970s to vest GAO with statutory authority to enforce its right of access in court.  In 1978, hearings on this legislation before a subcommittee of the House Committee on Government Operations, the Comptroller General provided a description of many instances of agency refusals to provide information and testified that "[o]ne of the principal needs of GAO is a means for enforcing the Comptroller General's existing rights of access to information in the possession of the executive branch."[35]  The executive branch strongly objected to this proposal, arguing that it would circumvent the process of

---

[32] *Id.* at 856-60.

[33] *Executive Branch Refusals, supra,* at 315.

[34] *Id.* at 317.

[35] *Strengthening Comptroller General's Access to Records:  New Procedure for Appointment, Hearings before the Legislation and National Security Subcomm. of the House Comm. on Government Operations,* 95th Cong., 2d Sess. 15 (May 17 and June 26, 1978); *see id.* 22-31, 63-71.

12

accommodation between the branches and suggesting an appeals procedure within the executive branch instead.  Ultimately, the legislation was enacted in an amended form which: (1) required that 20 days prior to filing suit the Comptroller General provide a report to Congress, the President, the Attorney General and others; and (2) provided that the President or the Director of OMB, in their unreviewable discretion, could block any suit by making certain certifications provided for by the statute.[36]

In short, the GAO information access statute was not judicially enforceable until legislation was adopted which explicitly authorized GAO to sue when it was denied access.[37]  Like GAO's original statute, which did not allow for judicial enforcement, Section 2954 contains no provision making it judicially enforceable. The only way Section 2954 could become judicially enforceable is if language were added, similar to the amendment to the GAO statute, explicitly authorizing seven Members of the Committee on Government Reform to sue if their request for information was denied.

---

[36] *See* 31 U.S.C. § 716(b), (d); Peter M. Shane, *Negotiating for Knowledge: Administrative Responses to Congressional Demands for Information*, 44 Admin. L. Rev. 197, 232 (1992) (explaining how this statute promotes negotiation and informal dispute resolution).

[37] While GAO has had statutory authority to sue to obtain information since 1978, it has invoked this authority only once.  In February 2002 the Comptroller General brought suit against the Vice President seeking access to certain records of the National Energy Policy Development Group that were allegedly relevant to an investigation being conducted by the GAO into the Group's composition and activities.  The district court dismissed the case on standing grounds, and the Comptroller General chose not to appeal.  *Walker v. Cheney*, 230 F.Supp.2d 51 (D.D.C. 2002).

13

II.     **The Legislative History of Section 2954, and Existing House Mechanisms for Obtaining Executive Branch Information, Demonstrate That Section 2954 Was Not Intended to Be Judicially Enforceable.**

A.      **Nothing in the Legislative History of Section 2954 Indicates That It Was Intended to Be Judicially Enforceable.**

Section 2954 was originally proposed as a committee amendment to a bill, H.R. 12064, whose purpose was

> to repeal certain acts or parts of acts requiring the submission to Congress, to the extent of such requirement, of the reports, and statements listed in the bill. Many of these statutory requirements are absolete [sic], while others require reports or statements that have no value and serve no useful purpose. Some of the departments and establishments have discontinued submitting these valueless reports and statements to the Congress, while others still comply with the statutory requirement.

H.R. Rep. No. 1757, 70th Cong., 1st Sess. 2-3 (1928) (Report of the House Comm. on Expenditures).  The House report notes that "[t]o save any question as to the right of the House of Representatives to have furnished any of the information contained in the reports proposed to be abolished, a provision has been added to the bill requiring such information to be furnished to the Committee on Expenditures or upon the request of any seven members thereof." *Id.* at 6.  Believing this to be a "wise provision," the Senate Committee on Expenditures added an amendment to give the same power to itself or any five members, thereby "mak[ing] it possible to require any report discontinued by the language of this bill to be resubmitted to either House upon its necessity becoming evident to the membership of either body."[38]  In this form the Act was passed by both houses without objection.

---

[38] S. Rep. No. 1320, 70th Cong., 1st Sess. 4 (1928); *see also* 69 Cong. Rec. 10613 (May 29, 1928) (statement of Sen. Sackett) ("There is also a section under which the committee could reinstate any report that was found to be needed."

14

1    Nothing in the legislative history of Section 2954 indicates that the provision

2 was intended to be judicially enforceable. A change that would "so profoundly

3 affect Congress" would be expected to have been made explicitly, or at least to have

4 been recognized in the many congressional hearings, reports and debates on the

5 subject of executive withholding of information. *See Dep't of Commerce v. United*

6 *States House of Representatives*, 525 U.S. 316, 343, 119 S.Ct. 765, 779, 142

7 L.Ed.2d 797, 820 (1999) (congressional silence would be particularly unexpected

8

9 on a legislative change that would "profoundly affect Congress"); *Jones v. United*

10 *States*, 526 U.S. 227, 234, 119 S.Ct. 1215, 1220, 143 L.Ed.2d 311, 321 (1999)

11 ("Congress is unlikely to intend any radical departures from past practice without

12 making a point of saying so.").

13      **B.     Existing Congressional Mechanisms for Compelling the**
14             **Production of Executive Branch Information Also Suggest That**
15             **Congress Did Not Intend That Section 2954 Would Be Judicially**
16             **Enforceable.**

17    Congress has today, and had in 1928, a variety of mechanisms available to

18 compel the executive branch to produce information. If Section 2954 were

19 judicially enforceable, it would vest seven Members of the House with a power

20 equal to, if not greater than, the power of the House itself. Moreover, if Section

21 2954 were judicially enforceable, the ability of Congress to obtain information

22 from the executive branch could be severely impaired. It is therefore unlikely, if

23 not inconceivable, that Congress passed Section 2954 with the intention that it be

24 judicially enforceable.

25

26    Each House of Congress has the inherent constitutional power to demand

27 information needed in support of its legislative function by subpoena. As the

28 Supreme Court has held:

> A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information – which not infrequently is true – recourse must be had to others who do possess it.  Experience has taught that mere requests for such information often are unavailing, and also that information which is volunteered is not always accurate or complete; so some means of compulsion are essential to obtain what is needed.

*McGrain v. Daugherty*, 273 U.S. 135, 175, 47 S.Ct. 319, 329, 71 L.Ed. 580, 593 (1927).

One tool available to the House to obtain information is the resolution of inquiry, which is used to obtain information from the executive branch.[39]  It is a "simple resolution making a direct request or demand of the President or the head of an executive department to furnish the House of Representatives with specific factual information in the possession of the executive branch."[40]  Such a resolution is accorded a privileged status under House Rules and practice.[41]

Although less common in modern practice than in the 19th and early 20th centuries, the resolution of inquiry is still used as a means of obtaining information from the executive branch on a wide range of significant matters.[42]  The executive

---

[39]  Wm. Holmes Brown, *House Practice: A Guide to the Rules, Precedents and Procedures of the House* 799, 104th Cong., 2d Sess. (1996) [hereinafter "*House Practice*"].

[40]  7 Deschler, *Precedents of the House of Representatives*, ch. 24, § 8 (1977).

[41]  *See* Rule XIII(7) of the Rules of the U.S. House of Representatives (108th Cong.).

[42]  *See* Walter J. Oleszek, *Congressional Procedures and the Policy Process* 314-15 (4th ed. 1996) (discussing 1995 resolution of inquiry seeking documents

16

1  branch normally complies with such resolutions, but "there have been a number of

2  instances in which the officer named has refused or declined to provide some or all

3  of the information sought."[43]   There is "no specific provision for enforcing

4  resolutions of inquiry;"[44] thus, "[t]he effectiveness of such a resolution derives

5  from comity between the branches of government rather than from any elements of

6  compulsion."[45]

7

8      Another, more common, tool available to the House is the subpoena power.

9  House Rules empower all standing committees and subcommittees to issue

10  subpoenas to compel testimony or the production of documents.  Rule XI(2)(m) of

11  the Rules of the U.S. House of Representatives (108th Cong.).  If specifically

12  authorized by committee rule, the power to issue a subpoena may be delegated to

13  the chairman of the full committee.  Rule XI(2)(m)(3)(A)(i) of the Rules of the

14  U.S. House of Representatives (108th Cong.).  Neither the chairman nor the

15  committee, however, may enforce a subpoena except as "authorized or directed by

16  the House."  Rule XI(2)(m)(3)(C) of the Rules of the U.S. House of

17  Representatives (108th Cong.); *see also In re Beef Industry Antitrust Litigation*,

18  589 F.2d 786, 790 (5th Cir. 1979) (holding that House Rule "requires House

19

20

21  _____

22  relating to President Clinton's use of the Exchange Stabilization Fund to shore up

23  the value of Mexico's currency); *House Practice* 804.

24      [43] *House Practice* 804; *see, e.g.*, 6 Chris Cannon, *Precedents of the House of

25  Representatives*, §§ 434-35 (1936); 2 Hinds, *supra*, at §§ 1509-13, 1518-19, 1534,

26  1561.

27      [44] *House Practice, supra*, at 804.

28      [45] 4 Deschler, *supra*, at ch. 15, § 2.

authorization not only for direct enforcement of a subpoena but also in any instance when a House committee seeks to institute or to intervene in litigation . . ., particularly when the purpose is . . . to obtain the effectuation of a subpoena.").

If a witness resists a congressional subpoena, one means of compulsion available to each House of Congress is the inherent contempt power, pursuant to which the House or Senate may direct its Sergeant at Arms to arrest a recalcitrant witness for trial and potential imprisonment by that House. *See id.* at 174-80; *Anderson v. Dunn*, 19 U.S. (6 Wheat) 204 (1821).  Because of the practical difficulties involved with conducting a trial before the bar of either House, however, the inherent contempt power has not been used for more than sixty years.[46]

An alternative mechanism used to enforce congressional subpoenas is the criminal contempt statute, which provides that any person who wilfully fails to comply with a congressional subpoena for testimony or documents is guilty of a crime punishable by fine or imprisonment.  2 U.S.C. § 192.  This applies not only to subpoenas issued by either House of Congress, but also to subpoenas issued by congressional committees or subcommittees exercising authority pursuant to a "clear delegation" from the parent House.  *Gojack v. United States*, 384 U.S. 702, 716, 86 S.Ct. 1689, 1698, 16 L.Ed.2d 870, 880 (1966).[47]  However, before a person may be

---

[46] Morton Rosenberg, *Investigative Oversight: An Introduction to the Law, Practice and Procedure of Congressional Inquiry* 14, CRS Report for Congress (1995).

[47] Numerous Supreme Court decisions have upheld convictions of individuals who defied subpoenas of congressional committees for testimony or documents in violation of this statute. *See, e.g., Wilkinson v. United States*, 365 U.S. 399, 81

18

1  prosecuted for contempt under this statute, the facts underlying the contempt must be
2  reported by the committee to the full House, which, if in session, must then vote to
3  refer the matter to the U.S. Attorney for prosecution.  2 U.S.C. § 194; *see Wilson v.*
4  *United States*, 369 F.2d 198, 203-04 (D.C. Cir. 1966).[48]

5       Prior to World War II, congressional subpoenas were rarely directed to
6
7  executive branch officers.  Modern practice has seen subpoenas increasingly used
8  with respect to executive officials, and such subpoenas are now routinely used to
9  compel the production of executive branch information which an executive branch
10 agency resists providing upon simple request.[49]  If an executive official fails to
11 comply with a subpoena, the committee can threaten to hold the official in
12 contempt, an action that has been taken against a number of cabinet officials in the
13

14 _____

15 S.Ct. 567, 5 L.Ed.2d 633 (1961); *Braden v. United States*, 365 U.S. 431, 81 S.Ct.
16 584, 5 L.Ed.2d 653 (1961); *Barenblatt v. United States*, 360 U.S. 109, 79 S.Ct.
   1081, 3 L.Ed.2d 1115 (1959).

17 [48] A rarely used provision of the statute allows the Speaker of the House or the
18 President Pro Tempore of the Senate, as the case may be, to refer a committee
19 contempt report for prosecution when the Congress is not in session.  2 U.S.C. §
20 194.  In the one case which considered such an action, the court reversed the
   conviction on the ground that the Speaker had failed to exercise independent
21 judgment in considering the propriety of the committee report, thus providing "a
22 substitute for the kind of consideration which would be provided by the house if it
   were still in session" and a "check against hasty action on the part of the
23 committee."  *Wilson*, 369 F.2d at 203-04 (citation omitted).

24 [49] *See* Neal Devins, *Congressional-Executive Information Access Disputes: A*
25 *Modest Proposal – Do Nothing*, 48 Admin. L. Rev. 109, 113 (1996) ("When
26 Congress conducts investigations, the single formal tool it can use to compel the
   production of information it desires is the subpoena.  A subpoena allows Congress
27 to tell the agency unequivocally that Congress is entitled to the information and
28 that any attempt to hinder its access will be futile.").

years since Watergate.[50]  In most cases the executive branch has been compelled to produce the information sought when a congressional committee has escalated a dispute to this level.[51]  However, because the executive branch controls the machinery for prosecution, there are also incentives for the legislative branch to attempt to resolve the dispute short of an actual contempt referral to the U.S. Attorney.[52]  In fact, there has been only one occasion in history where the full House has voted to refer an executive branch official (EPA Administrator Anne Gorsuch) to the U.S. Attorney for contempt, and this matter was resolved shortly thereafter without a prosecution.[53]

   A September 2001 dispute between the House Committee on Government

---

[50] *See* Peterson, *supra*, at 571 ("Beginning in the mid-1970s, congressional committees turned with increasing frequency to the threat of contempt of Congress to enforce demands for information from the executive branch."); Fisher, *supra*, at 23-31 (discussing contempt proceedings against various cabinet officials from the mid-1970s to the late 1990s).

[51] *See* Randall K. Miller, *Congressional Inquests: Suffocating the Constitutional Prerogative of Executive Privilege*, 81 Minn. L. Rev. 631, 669-70 (1997) (arguing that an analysis of recent legislative-executive disputes over information demonstrates that the executive branch cannot effectively assert even allegedly valid claims of executive privilege once Congress escalates the dispute beyond the subpoena stage).

[52] *United States v. The House of Representatives of the United States*, 556 F.Supp. 150, 153 (D.D.C. 1983) ("The difficulties apparent in prosecuting [an executive official] for contempt of Congress should encourage the two branches to settle their differences without further judicial involvement.  Compromise and cooperation, rather than confrontation, should be the aim of the parties.").

[53] *See* Stanley M. Brand & Sean Connelly, *Constitutional Confrontations: Preserving a Prompt and Orderly Means by Which Congress May Enforce Investigative Demands Against Executive Branch Officials*, 36 Cath. U. L. Rev. 71, 77-83 (1986).

20

Reform and the Department of Justice illustrates this point.  The Committee issued
a subpoena to Attorney General Ashcroft seeking two distinct categories of internal
Justice Department memoranda: (1) those relating to the recent investigation of
campaign finance abuses during the Clinton Administration; and (2) those relating
to corruption and misconduct in the handling of confidential informants by federal
law enforcement officials in Boston during organized crime investigations of the
1960s and 1970s.  President Bush invoked executive privilege and instructed the
Attorney General not to comply.

The Government Reform Committee then held a number of hearings related
to the invocation of executive privilege, and specifically with regard to the question
of whether there was any legal or historical precedent with respect to the
withholding of the Boston documents.  It quickly became apparent at these hearings
that there was a strong bipartisan consensus on the Committee that the executive
branch's position with respect to the Boston documents was utterly without merit.
While many members also believed that the campaign finance documents should be
produced, this issue was potentially more politically divisive and of less immediate
interest to the Committee.  Accordingly, as a result of the pressure generated by
these hearings, the Committee was able to reach an accommodation with the Justice
Department that allowed the Committee to obtain access to the Boston documents,
but not to the campaign finance memoranda.

If a minority of the Committee could sue the executive branch under Section
2954, this process of negotiation and compromise could be dramatically altered.  If
any seven Members (less than one-sixth of the Committee in the current Congress)
disagreed with the proposed compromise, they could sue (or threaten to sue) for more

21

information.  This would very likely eliminate or drastically reduce the executive branch's incentive to compromise, and thereby undermine the Committee's negotiating posture.

Even worse, from the House's institutional perspective, is the fact that it would have no say in which disputes were presented for judicial resolution.  While the executive branch could prevent weak claims of executive privilege from being litigated simply by producing the information demanded, the House would not be able to stop a small group of members from litigating a case in which the executive's interest in non-disclosure appeared relatively strong in comparison to the congressional need for the information.  In the long run, judicial resolution of such cases would inevitably undermine the House's ability to obtain information from the executive branch.

Neither before 1928 nor after has Congress ever given a small group of Members the equivalent of subpoena power and the ability to enforce it.  It is almost impossible to imagine that Congress would have intended, in passing Section 2954, to so radically change the dynamic of executive-legislative disputes over information access – and to change it to Congress's own detriment.  This strongly indicates that Section 2954 was never intended by Congress to be judicially enforceable, and that the courts should not now interpret the statute to permit a judicial remedy.

III.   **Judicial Enforcement of Section 2954 Would Conflict With the Reluctance of the Courts to Intervene in Information Access Disputes Between the Legislative and Executive Branches.**

Even where a true political impasse has been reached, the courts have been reluctant to intervene in executive-legislative information access disputes.  There have only been three court decisions involving information access disputes between

22

1  Congress and the Executive, and in two of these cases the courts refused to even

2  reach the merits because they believed judicial involvement was improper.

3      The first of these two cases was *United States v. AT&T*, 567 F.2d 121 (D.C. Cir.

4  1977).  In that case, the Department of Justice attempted to enjoin AT&T's compliance

5  with a subpoena issued by a House subcommittee.  The Department of Justice argued

6  that the executive branch had exclusive control over the information because it related to

7  national security.  The House intervened in the case, and argued that its investigatory

8  power entitled it to the information.  The court stated that judicial intervention in

9  

10  executive privilege disputes between the executive and Congress was improper unless

11  there had been a good faith effort at compromise.  *Id.* at 127-28.  The court wrote that

12  "each branch should take cognizance of an implicit constitutional mandate to seek

13  optimal accommodation through a realistic evaluation of the needs of the conflicting

14  branches in the particular fact situation."  *Id.* at 127.  Pursuant to the court's suggestion,

15  

16  the Department of Justice and the subcommittee ultimately were able to reach a

17  compromise wherein subcommittee staff were allowed to review some of the documents

18  but the Department retained custody of the documents.

19      The second case was *United States v. House of Representatives of the United*

20  *States*, 556 F.Supp. 150 (D.D.C. 1983).  In this case, the Department of Justice brought

21  a lawsuit seeking a declaratory judgment that the Administrator of the Environmental

22  

23  Protection Agency "acted lawfully in refusing to release certain documents to a

24  congressional subcommittee" at the direction of the President.  *Id.* at 151.  The court

25  dismissed the case because judicial involvement in an information access dispute

26  "concerning the respective powers of the Legislative and Executive Branches . . . should

27  be delayed until all possibilities for settlement have been exhausted."  *Id.* at 152.  The

28  

23

1  court went on to state that "[c]ompromise and cooperation, rather than confrontation,
2  should be the aim of the parties." *Id.* at 153.  As in the *AT&T* case, the two branches did
3  reach an accommodation.

4      If Section 2954 were to be deemed judicially enforceable, information access
5  disputes between the legislative and executive branches would not be – and could not be
6  – limited to situations in which the branches were unable to reach a resolution.  Instead,
7  a small group of Members of a single committee would be able to go to court to enforce
8  a demand for information.  This would inevitably lead to the sort of judicial involvement
9  in information access disputes that the courts have traditionally shunned.[54]
10

11
12
13
14
15
16
17
18
19
20

---

21  [54]  We note as well that if Section 2954 were to be found judicially enforceable,
the ramifications could readily extend beyond just that statute.  For instance,
22  federal law provides that the Congressional Research Service "shall have authority,
23  when so authorized by a committee and acting as the agent of that committee, to
request of any department or agency of the United States the production of such
24  books, records, correspondence, memoranda, papers, and documents as the Service
25  considers necessary, and such department or agency of the United States shall
comply with such request."  2 U.S.C. § 166(d).  If the Court rules that Section 2954
26  is judicially enforceable, there is no apparent reason why the CRS statute, as well
27  as other similar statutes, could not also be used as a basis for suing the executive
28  branch, thereby flooding the judiciary with even more legislative-executive
information access disputes.

24

## CONCLUSION

For the reasons stated herein, the defendant's Motion to Dismiss, or, in the alternative, the defendant's Motion for Summary Judgment, should be granted.

Respectfully submitted,

GERALDINE R. GENNET
General Counsel
KERRY W. KIRCHER
Deputy General Counsel

DAVID PLOTINSKY
Assistant Counsel
CHRISTINE M. DAVENPORT
Assistant Counsel
JOHN D. FILAMOR
Assistant Counsel

Office of General Counsel
U.S. House of Representatives
219 Cannon House Office Building
Washington, D.C. 20515-6532
(202) 225-9700
(202) 226-1360 (facsimile)

August 19, 2004

25

## PROOF OF SERVICE

I am employed in the Office of General Counsel for the U.S. House of Representatives in Washington, D.C.  I am over the age of 18 and not a party to this action.  My business address is 219 Cannon House Office Building, Washington, D.C. 20515-6532.

On August 19, 2004, I served the foregoing Amicus Curiae Brief of the Bipartisan Legal Advisory Group of the United States House of Representatives in Support of Defendant's Motion to Dismiss or in the Alternative for Summary Judgment on counsel for each party, as listed below.

__X__   (BY MAIL) I caused the foregoing documents to be served by placing a true copy of said documents, enclosed in a sealed envelope, and by placing said envelope, with postage thereon fully prepaid, in the United States first-class mail in Washington, D.C., addressed to counsel for each party at the address shown on the service list below.

David C. Vladeck, Esq.
Richard McKewen, Esq.
Georgetown University Law Center
600 New Jersey Ave., NW, Suite 312
Washington, D.C. 20001

Marvin E. Krakow, Esq.
Law Offices of Marvin E. Krakow
1801 Century Park East, Suite 1520
Los Angeles, CA 90067-2302

James J. Gilligan, Esq.
U.S. Department of Justice
Civil Division
Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044

David Plotinsky